Emilio Olivieri and Clara Olivieri v. Commissioner.
Olivieri v. Commissioner
Docket No. 3366-63.
United States Tax Court
T.C. Memo 1966-177; 1966 Tax Ct. Memo LEXIS 107; 25 T.C.M. (CCH) 920; T.C.M. (RIA) 66177; July 29, 1966
Martin M. Lore, 111 John St., New York, N. Y., for the petitioners. William F. Chapman, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1959 in the amount of $26,713.97 *108 and an addition to tax under the provisions of section 6653(a) of the Internal Revenue Code of 1954[1] for that same year in the amount of $1,335.70. Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for our decision the following: Whether the gain realized by petitioners upon the sale of a tract of land was long-term capital gain or ordinary income. Findings of Fact Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife residing in Kew Garden Hills, New York, filed a joint Federal income tax return for the calendar year 1959 with the district director of internal revenue at Brooklyn, New York. Emilio Olivieri (hereinafter referred to as petitioner) has been engaged in the construction business for approximately 40 years. During the first portion of this period he was a contractor, and for the last 20 to 25 years he has been a builder. During the time petitioner has been engaged in business as a builder, he has been a member of *109 partnerships engaged in the building business and has also been a stockholder, officer and employee of corporations engaged in the building business. For a number of years prior to 1956, petitioner's associates in the building business, both as partners and stockholders in corporations, were John Aragona hereinafter referred to as Aragona) and Lewis Keller (hereinafter referred to as Keller). At some time in 1956 Keller disassociated himself from building and selling of homes in participation with petitioner and Aragona, although the partnership of petitioner, Aragona, and Keller continued as such because of some properties which it held that were not disposed of until subsequent to the year here involved. Sometime after the middle and before the end of the year 1956 petitioner and Aragona had a disagreement as a result of which they decided they would no longer work together in the construction and sale of houses. Early in 1955 a corporation known as Jericho Associates, Inc., a New York corporation, the stock of which was held 43 3/4 percent by petitioner, 43 3/4 percent by Aragona, and 12 1/2 percent by Keller, purchased a tract of land in Princess Anne County, Virginia, consisting *110 of between 500 and 600 acres. A partnership consisting of these same persons with the same percentages of participation, acquired this property from Jericho Associates, Inc., by a deed executed on February 26, 1955. The tract of land in Princess Anne County, Virginia was acquired by the partnership of petitioner, Aragona, and Keller for the purpose of dividing it into several sections and building houses thereon and selling the houses. The partnership of petitioner, Aragona, and Keller retained certain commercial properties along a street known as Virginia Beach Boulevard. The entire acreage was known as Aragona Village. The purpose of building and selling homes in Aragona Village was accomplished by sections. The property was divided into 13 sections. Section 7 of the property consisted of approximately 92 acres. Section 7 was never developed, subdivided, or improved in any way by petitioner. However, this section was tentatively platted on June 23, 1956, for subdividing by the same surveyor who had previously surveyed and platted several other sections of Aragona Village. By deed made November 12, 1956, the partnership of petitioner, Aragona, and Keller transferred a portion *111 of the property in Princess Anne County, Virginia which it had acquired on February 26, 1955, to petitioner and Aragona. Development of certain sections of the acreage in Princess Anne County, Virginia was begun by the partnership of petitioner, Aragona, and Keller upon its acquisition of the property and was continued by petitioner and Aragona when Keller disassociated himself from their building business. Maps of the subdivision were filed and approval by the county planning commission of the subdivision was obtained. In certain sections the installation of streets and utilities and construction of model homes were begun. An advertising campaign for the sale of the homes through the use of brochures and other forms of advertising was conducted. Contracts for the sale of some homes to be constructed on designated lots were entered into. At the time the disagreement arose between petitioner and Aragona, they had contracted for sales of approximately 300 homes to be constructed in Aragona Village. In 1955 petitioner was, and had been for some time, a resident of New York. He considered that it would be necessary for him to spend some time in Virginia in connection with the subdivision *112 and the construction and sale of homes in Aragona Village. On January 26, 1956, petitioner acquired approximately an acre of land located at Bird Neck Point, Virginia Beach, Virginia, intending to construct a house thereon for the use of his family during the time that he would be in Virginia in connection with the Aragona Village project. The dispute between Aragona and petitioner arose because of Aragona's insistence that petitioner move permanently with his family to Virginia. After the dispute with Aragona, petitioner put the acre of land at Bird Neck Point into the hands of a real estate broker in Virginia City for sale and this property was sold by petitioner on January 10, 1957. After their disagreement petitioner and Aragona began a division of their jointly owned property. The lots which had been sold under contracts providing for the construction of houses thereon were sold by petitioner and Aragona to Amberjack, a corporation wholly owned by Aragona, with the understanding that Amberjack would build homes on these lots and fufill the contracts that had been entered into by petitioner and Aragona. Other sections which were not developed were transferred by petitioner *113 and Aragona to Norfolk United Builders, a corporation originally owned by petitioner, Aragona, and Keller in the same proportions as their partnership interests and later owned jointly by petitioner and Aragona. Norfolk United Builders platted these sections and improved the lots. After the improvement of the lots was completed, portions of the improved property were transferred to corporations owned entirely by petitioner and other portions were transferred to corporations owned entirely by Aragona. Each of these corporations planned to build houses on the improved lots and sell the properties so improved. On August 20, 1957, a plat for section 6 was filed for record, which plat had been signed by petitioner. On November 7, 1958, a plat for section 11 was filed for record by petitioner, Aragona, and Keller. Eventually all of the sections of Aragona Village, except section 7, had been transferred to Amberjack or to Norfolk United Builders. Section 7 was in an arrowhead shape located in the extreme northwest portion of the Aragona Village tract. One side of section 7 was bounded by a cemetery known as Rosewood Memorial Park, Inc., one side was adjacent to sections 5 and 9 of *114 the Aragona Village tract, and the third side was bounded by some undeveloped land. Section 7 was retained by petitioner and Aragona jointly without being advertised for sale or developed until September 15, 1958, at which time it was sold by petitioner and Aragona to Anthony Genovese (hereinafter referred to as Genovese). Genovese knew that petitioner and Aragona owned section 7 and without solicitation on the part of petitioner made an offer to petitioner to buy the land. After some negotiation, petitioner and Aragona sold the land to Genovese. On December 5, 1958, Genovese recorded a subdivision plat of section 7 which was substantially similar to the tentative plat of this section filed on June 23, 1956. Petitioner's share of the total contract price for the sale of section 7 was $147,950 and petitioner's basis in this property was $29,587.99. In 1958 petitioner received cash of $23,562.50 for the property and on his income tax return for that year elected to report the sale on the installment basis reporting in 1958 a gain of $18,850.24. In 1959 petitioners reported a gain of $67,100.84, which petitioners on their income tax return treated as long-term capital gain. Respondent *115 in his notice of deficiency disallowed petitioners' "long-term capital gain deduction" and increased the income reported by petitioners in the taxable year 1959 by $33,550.42, with the following explanation: It has been determined that the installment sale of land on September 18, 1958 represented ordinary income instead of capital gain. Therefore the gain does not qualify for Section 1202 deduction. Opinion Section 1221 [2] defines capital asset as property held by a taxpayer with certain exceptions. The only one of those exceptions which respondent claims is applicable in the instant case is the one which excludes from the definition of capital asset property held by a taxpayer "primarily for sale to customers in the ordinary course of his trade or business." The exclusion from the definition of capital asset of such property has given rise to much litigation. Generally it has been recognized that the issue is primarily factual. *116 The evidence here shows that the entire Aragona Village tract in Princess Anne County, Virginia was originally acquired by petitioner, Aragona, and Keller for the purpose of subdividing the land, improving it section by section into improved lots, and selling homes to be constructed thereon. This was likewise the intent of petitioner and Aragona with respect to all of the property in Aragona Village which they owned at the time Keller withdrew from engaging in building operations with petitioner and Aragona. Although section 7 was acquired and originally held by petitioner for sale to customers in the ordinary course of his trade or business, petitioner contends that it was not being held for this purpose when it was sold to Genovese. Petitioner contends that approximately 2 years prior to the sale of section 7 to Genovese when he and Aragona had a disagreement, section 7 was converted to investment property and that the property was being so held by them when it was sold. The issue to be decided is the purpose for which the property was being held when it was sold, and the purpose for which it was acquired or held at some prior time has relevance only insofar as it bears upon *117 this question. Eline Realty Co., 35 T.C. 1 (1960). See also S. O. Bynum and Fannie R. Bynum, 46 T.C. 295 (June 3, 1966). It is petitioner's position that at the time of his rift with Aragona, he and Aragona decided to divide the various properties they owned jointly after the properties had been improved and made available for building, except that they agreed to continue to hold section 7 jointly without improvement thereto since they considered that it would increase in value and be a good investment. Petitioner's testimony is that after the disagreement, he and Aragona sold the improved lots subject to sales contracts which contracts included construction of houses thereon, to Amberjack a corporation owned by Aragona. Petitioner stated that this property was sold at a profit and was to be paid for as Amberjack built and received payment for the lots and houses constructed thereon. Petitioner testified that the balance of the property which he and Aragona owned in Aragona Village, except section 7, was transferred to Norfolk United Builders, which corporation he and Aragona owned jointly. This property was transferred to this corporation for the purpose *118 of having the corporation develop the property by subdividing it into lots and installing utilities, roadways, and similar items. Petitioner testified that this development work was actually performed by the corporation and after its completion the developed lots were transferred by Norfolk United Builders either to one of petitioner's building corporations or one of Aragona's corporations, as was the intent when the property was transferred to Norfolk United Builders. This division of the property was made in order that petitioner and Aragona each could continue individually to build houses for sale in Aragona Village even though they had decided not to continue jointly in the building business. Petitioner's explanation of why he and Aragona did not transfer section 7 to Norfolk United Builders to be improved and divided between them was, "We thought we would keep this for investment. We knew that the value would appreciate and we just left it there and kept it as an investment." If petitioner's testimony were accepted as proof that in 1956 when petitioner and Aragona had a disagreement section 7 was converted from property held primarily for sale to customers in the ordinary course *119 of petitioner's trade or business to property held for investment purposes, this issue here would thereby be resolved. It is well settled that a person engaged in the real estate or building business may hold some real property for sale to customers in the ordinary course of his trade or business and other real property as a capital asset. Eline Realty Co., supra, at page 5. S. O. Bynum and Fannie R. Bynum, supra.However, petitioner's statement in his testimony as to his conclusion with respect to the ultimate fact to be decided in this case is no more substantial proof of that fact than his statement on his income tax return that the property was a capital asset. Petitioner's testimony as to the purpose for which the property was held will be considered in conjunction with all other facts of record in reaching our conclusion as to the purpose for which section 7 was being held when petitioner sold it in 1958. In determining the issue herein, we are governed by the definition of "primarily" given by the Supreme Court in Malat v. Riddell, 383 U.S. 569 (1966). In that case the Supreme Court held that the word "primarily" as used in section 1221(1) *120 means "of first importance" or "principally." See the discussion of Malat v. Riddell, supra, in S. O. Bynum and Fannie R. Bynum, supra. Petitioner's ordinary business was the sale of improved properties to individuals purchasing a home. These individual home purchasers were petitioner's ordinary customers. Petitioner did not ordinarily sell undeveloped property to another person in the real estate business. Petitioner stresses this fact in support of his contention that section 7 was being held as an investment when it was sold. Respondent takes the position that the only reason section 7 had not been transferred to Norfolk United Builders for development is that the development of Aragona Village was being done section by section, and section 7 had not been reached for development in its normal turn when it was sold. Respondent contends that section 7 was being held to be developed into lots for building when petitioner received an offer for its purchase. Respondent contends that even though section 7 had not been developed to a point to be ready for sale by petitioner in the ordinary course of his trade or business when it was sold, it was being held *121 for that purpose at the date of its sale. The fact that property had not been developed when it was sold does not, standing alone, require a conclusion that it was not being held for sale to customers in the ordinary course of a taxpayer's trade or business when that business is the sale of developed property. James E. Kesicki, 34 T.C. 675 (1960). In holding in that case that the property there involved was held for sale to customers in the ordinary course of the taxpayer's trade or business, we stated that "The character of the property was not changed by the failure to carry out the original plan" for which it was acquired. Were we to conclude in this case that petitioner's primary purpose in holding section 7 continued to be to develop that property into building lots and while plans for this development were being worked out the property was sold, this case would fall within our holding in James E. Kesicki, supra. However, as we stated in D. L. Phillips, 24 T.C. 435, 448 (1955), "A decision to sell investment property, however, does not alone establish that it is thereafter held primarily for sale in the ordinary course of a business. *122 " The numerous cases involving the application of section 1221(1) to sales of real property all start with the premise that the fact that real property is sold is not of itself proof that the property was being held primarily for sale to customers in the ordinary course of the taxpayer's trade or business. To recite the many factors which are considered by the courts in determining whether a particular piece of property is being held for sale to customers in the ordinary course of a taxpayer's trade or business would be of little value in this case which involves an unusual set of circumstances. However, in reaching our decision we have considered the various factors generally considered in making the required factual determination. The numerous factors to be considered are detailed in many cases decided by this and other courts. See, for example, James G. Hoover, 32 T.C. 618, 625 (1959). The facts here show activity with respect to other sections of Aragona Village and disposition of the other parcels as lots ready for building. We think that the lack of any action with respect to section 7 and the fact that petitioner and Aragona continued to hold it jointly as individuals *123 when other sections of Aragona Village were transferred to other entities supports a conclusion that petitioner and Aragona were undecided with respect to their intent as to the use to be made of section 7. They were holding it without having taken any action which would commit them to its development or to retaining it for investment in the hope of "the realization of appreciation in value accrued over a substantial period of time." See quotation from Commissioner v. Gillette Motor Co., 364 U.S. 130, 134 set forth in Malat v. Riddell, supra.When the property was sold neither of these purposes had crystallized into being a principal purpose or one of first importance. Before petitioner and Aragona reached a firm decision as to the treatment of section 7, Genovese's unsolicited offer was received and petitioner and Aragona sold the property to him. Under these circumstances we interpret Malat v. Riddell, supra, as requiring the conclusion that petitioner was not holding section 7 primarily for sale to customers in the ordinary course of his trade or business at the time of the sale of that property in 1958. We therefore hold that petitioner *124 properly treated the gain on the sale of section 7 as capital gain. Because of other adjustments in the notice of deficiency, Decision will be entered under Rule 50. Footnotes
1. All references are to the Internal Revenue Code of 1954. At the trial respondent conceded that there is no addition to tax.↩
2. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include - (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; * * *↩