H. M. SILVERSTEIN and Continental Illinois National Bank and Trust Company, Co-Executors of the Estate of Mary H. Thompson, Deceased, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 66 C 142.

United States District Court
N. D. Illinois, E. D.

Nov. 15, 1968.

Sol A. Hoffman, Maurice L. Davis, David I. Hoffman, and Melvin A. Blum, Hoffman & Davis, Chicago, Ill., for plaintiffs.

Thomas A. Foran, U. S. Atty., for the Government.

## MEMORANDUM OPINION

Cross Motions for Summary Judgment

MAROVITZ, District Judge.

This is an action to recover income taxes alleged to have been illegally and erroneously assessed and collected. This Court has jurisdiction under 28 U.S.C. § 1346(a) (1).

Mary Harding Thompson (hereafter Mary) instituted this suit to recover federal income taxes on January 20, 1966. She died on January 27, 1966.

By order of this Court the present plaintiffs, co-executors of her estate, were substituted on October 24, 1966.

Mary timely filed her 1959, 1960 and 1961 individual income tax returns with the Internal Revenue Service and paid the amount of tax computed by her to be due. The District Director of Internal Revenue then assessed additional taxes for those three years on the basis that an additional $10,000 should be included in her income in the year 1959, and that an additional $12,000 should be included in her income for each of the years 1960 and 1961. The additional taxes, for all three years, amounted to $18,-357.50, and were paid by Mary to the District Director, together with interest, on January 29, 1965. On March 5, 1965, Mary Thompson filed claims for refund of those taxes with the District Director; these claims have not been allowed.

George F. Harding, Mary's father, died testate on April 2, 1939. George Harding's will left the residue of his estate in trust to Jessie Katz, as trustee, directing the trustee to pay out of income, or from the corpus if income was insufficient, the sum of $12,000 per year, in monthly installments, to Mary, his sole heir at law, for life and thereafter $6,000 per year in monthly installments to each of his two grandchildren (Mary's children) George and Penelope, for life. Any income of the trust estate not payable to these three was to go to the George F. Harding Collection, now known as the George F. Harding Museum. Upon the death of the last of these three, the trustee was to distribute the remainder of the trust estate to the museum.

Subsequent to the 1942 amendment of the Internal Revenue Code, a dispute arose between Mary and the museum as to the interpretation of the trust instrument with respect to the payment of income taxes on sums distributed to Mary by the trustee. It was contended by Mary that her father had intended that she receive trust distributions free of taxation. It was the position of the museum that the trust instrument was subject to interpretation in this regard and in 1950 the trustee filed suit in Superior Court of Cook County, Illinois requesting an interpretation of the trust with respect to the propriety of the payment from the trust estate of income taxes becoming payable by Mary on sums distributed to her by the trustee.

On July 9, 1951, Mary, the museum and the trustee entered into an agreement which, as later amended, provided that (1) the Superior Court case would be held in abeyance until the youngest of Mary's children attained majority; (2) the trustee would make payment to Mary of a sum equal to her income taxes (computed at her highest tax bracket) payable by reason of her receipt from the trust estate of $12,000.00 per year during the years 1942 through 1950 and would make payment to Mary in each year of a sum equal to her income tax (computed at her highest tax bracket) payable by reason of her receipt from the trust estate of $12,000.00 during the previous year; (3) Mary and the museum each retained the right to apply to a court of competent jurisdiction to determine Mary's right to receive such income tax reimbursement under her father's will; and (4) if such issue were determined adversely to Mary she would refund all such reimbursements to the trustee.

Between 1951 and 1957 the trustee and Mary, for personal reasons, found it increasingly difficult to maintain a compatible relationship. In 1957, the trustee instituted a suit, amended by her in 1958, whereby she sought to have her accounts approved and to have the question of the trust's liability for Mary's income taxes on the amounts paid to her resolved and to have herself discharged as trustee.

The successor trustee, as nominated by the decedent, refused to serve.

Early in the next year, on January 15, 1959, the three life beneficiaries under George Harding's will, together with the trustee and the museum (the remainderman), entered into an agree-

ment whereby, with court approval, the trust would terminate and all of the assets would go to the museum as the absolute owner, free of trust, with the proviso that the museum would "continue to make the annual payments of $12,000.00 per year to Mary Harding Thompson throughout her lifetime". Provision was also made in the agreement to make the $6,000 per year payments to George and Penelope on Mary's death.

The agreement also contained a proposed form of court decree which was entered, without change, by the Circuit Court of Cook County on March 16, 1959, approving the parties' actions. This decree approved the accounts of the trustee, permitted her resignation, terminated the trust and distributed all of the assets to the museum as absolute owner thereof.

Consequently, the trustee was no longer the source of monthly payments to Mary. The museum began making the $1,000 payments as of March, 1959. It made no payments to Mary during the years 1959, 1960, and 1961 on account of income taxes.

■ It is the museum's monthly payments which are the subject of this action. The question to be decided is whether the transaction under which the museum received the assets of the trust in exchange for the obligation to pay Mary and her children their respective allotments was, in fact, a sale of a capital asset, as contended by plaintiffs, or was a meaningless change in payors, as contended by the Government. The determination of whether a sale of a capital asset occurred requires an examination of the nature of a capital asset and the purpose of the law relating to the sale of such entities. Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960); Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 265, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958). Further, as with most tax questions, we must look to the

substance and effect rather than just to the form of the transaction. Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 266–267, 78 S.Ct. 691 (1958); Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788 (1940).

■ The Internal Revenue Code, 26 U.S.C. § 1221 defines a capital asset as "property held by the taxpayer (whether or not connected with his trade of business)," but not including five particular categories of property not relevant here. However, the concept of a "capital asset" is not an expansive one.

"(I)t is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term 'capital asset' is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. (citation omitted)." Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S.Ct. 1497, 1500 (1960).

The instant case does not involve the appreciation of property which was held over a long period of time in a risk situation. United States v. Midland-Ross Corp., 381 U.S. 54, 57, 85 S.Ct. 1308, 14 L.Ed.2d 214 (1965); Lowndes v. United States, 384 F.2d 635 (4th Cir. 1967). There is no threat of an inordinately large and burdensome tax being levied on accumulated gain. Rather, the consideration which Mary was to receive over time, from the museum, was a substitute for the payments which she was to have received from the trust. In Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691 (1958), the taxpayer had received a lump sum consideration for the assignment of certain oil payment rights which were carved out by taxpayer from a

larger mineral interest producing taxable income. In holding that there was no capital asset and that the consideration received was ordinary income, the Court said, in words particularly suited to the instant issue:

> "The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of income-producing property." 356 U.S. at 266, 78 S.Ct. at 695.

The property interest in this action is similar to that in *Lake*, in that Mary's right to future income was exchanged for income which she would have received in any event. The only consequence of the fact that Mary was to be paid periodically and did not receive a lump sum payment is that it emphasizes that, even at ordinary income rates, her tax burden would be even less than that of a person who, as in *Lake*, received a lump sum payment. See Holt v. Commissioner of Internal Revenue, 303 F.2d 687, 690–691 (9th Cir. 1962).

 Another relevant case is May T. Hrobon, 41 T.C. 476, 492 (1964). There taxpayer transferred to her former husband all right, title and interest in a trust life estate, but, by agreement, was to receive sixty per cent (60%) of the net distribution of the trust for herself for life. The Tax Court recognized the principle advanced in the *Gillette* case that not all property rights, though valuable, are capital assets within the narrow confines of the capital gains provisions. Thus it found that the transaction did not amount to a capital transaction.

 Moreover, when we examine the nature and effect of this transaction, we are convinced that, for the tax purposes advanced here, the scheme was a sham. What was agreed to by the respective parties was not really a sale at all, but a change in administration of the trust funds. Mary exchanged a right to periodic payments for a right to periodic payments. The museum remains the remainderman and became owner of the trust property and the payor. Plaintiff suggests that a variety of changes in the relationship of Mary and the museum resulted from the exchange, including loss of a fiduciary relationship, lack of an interest in a specified fund, susceptibility to statutes of limitations, and receipt of an unsecured obligation. Plaintiff also acknowledges that a number of advantages resulted from the transaction notably that the museum's entire credit and assets stood behind their new obligation. We are not convinced that these "changes" are at all meaningful. We find no indication from plaintiff that the procedural differences such as those created by a bar of limitations as opposed to laches is economically significant. Nor do we think that the allegation that Mary's right to receive payments from the museum was an unsecured right makes any difference, for again there is no indication that the assets received would be insufficient to produce the requisite income or, if they were, that the balance of the museums assets would ever be insufficient to protect Mary's interest.

In reality what Mary gave up with her right hand, she got back with her left. Her income interest was as secure as it always had been. Indeed, if the transaction terminating the trust had economic impact such as plaintiff suggests, one wonders how it is that the unsecured obligation of the museum was adequate consideration for the transfer of trust assets and that no other monetary adjustments had to be made. Surely, if there was any doubt about the ability of the museum to pay, something other than an even exchange would have been arranged.

Once again May T. Hrobon, 41 T.C. 476, 496 (1964) is in point. Evaluating the transaction in light of its purpose and

end result, as well as the capital gains principles of the *Gillette* case, the Tax Court held that the end result of the transaction was that the transferor received sixty per cent of the income to which she had been entitled prior to the transaction. Consequently, it found that "(t)he transaction effected no substantial change in the economics of the situation as between (the parties)." 41 T.C. at 496. The maintenance of the status quo, as far as Mary's income interest is concerned, seems to have been a vital purpose of the agreement. (Agreement ¶ 3(a)). The Circuit Court's order (¶ 8) describes the agreement as one "whereunder they (the beneficiaries) will be paid the same benefits as those provided under said Will." Thus, in the instant case, transferor received not sixty, but one hundred per cent of the income to which she was previously entitled. Not only is it difficult to discern any substantial economic effect here, it is difficult to find any, albeit insubstantial, economic effect.

Plaintiff contends that Gladys C. Evans, 30 T.C. 798 (1958) is the case most factually like the instant one and is, therefore, controlling. In that case, the holder of a life interest in trust income transferred all of her interests to her husband in exchange for his agreement to pay her a set amount of money each year of her life. The Tax Court held that the transaction did effect a transfer of the ownership of the life interest, that the petitioner had not recovered the basis she had in the life estate and that the income attributable to the income interest was not taxable as such to her. We would agree that the *Evans* case closely resembles the one at issue here, but find that the Tax Court's reasoning in that case, which leaves much to be desired in any event, has been undermined and effectively overruled by the higher and more recent authority discussed earlier. Granted that *Evans* was decided and acquiesced in by the Commissioner, 1958–2 Cum.Bull 5, a few months after the *Lake* decision, it certainly does not command more respect than that Supreme Court decision. Plaintiff's argument that *Lake, Gillette,* and *Hrobon* are distinguishable because they involve the transfer of limited or fractional, not entire and fixed, interests is not persuasive. Those decisions demonstrate particular concern for looking at the realities of the situation, the substance and not the form of the transaction. There is no indication in any of them that such scrutiny is to be limited to purported transfers of partial interests. What is to be examined is what is transferred, not what is left.

Finally, to adopt the rule that plaintiff advances would open an undesirable and improper tax loophole. Two beneficiaries of equivalent income interests could "sell" or swap their interests to each other and, under plaintiff's logic, be taxed at capital gains and not ordinary income rates. Yet, the exceptional treatment accorded to capital transactions is not so easily won. Section 1221, which defines a capital asset, "has always been narrowly construed so as to protect the revenue against artful devices. (Citation omitted)." Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 265, 78 S.Ct. 691, 694 (1958).

■ Summary judgment is appropriate when, as here, there is no substantial factual controversy which requires a trial and the only question is whether one party is entitled to prevail as a matter of law. We believe, in summary, that the property interest which was transferred lacked certain characteristics of a capital asset, that the taxpayer was in virtually the same economic position before and after the agreement with the museum, that the central purpose of capital gains treatment, the easing of a disproportionate tax burden, is not relevant here and that to adopt plaintiff's rule would create an undesirable and improper tax loophole. Consequently, plaintiff's motion for summary judgment is denied and the Government's motion for summary judgment is granted.