ESTATE OF ETHEL P. GREEN, DECEASED, DAVID L. GREEN, EXECUTOR, PETITIONER *V.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 17956–80.     Filed May 30, 1984.

*Joel E. Miller,* for the petitioner.
*Robert J. Alter,* for the respondent.

OPINION

TANNENWALD, *Judge*: Respondent determined a deficiency of $165.29 in petitioner's Federal estate tax. The sole issue for decision is whether the value of an annuity contract purchased by decedent's employer, a city school board, for the decedent's benefit is excludable from decedent's estate under section 2039(c)(3).[1]

This case was submitted fully stipulated pursuant to Rule 122. The stipulations of fact and exhibits attached thereto are incorporated herein by this reference.

Petitioner is the Estate of Ethel P. Green, represented by its executor, David L. Green. At the time he filed the petition herein, David L. Green resided in Jamaica, N.Y. Ethel P. Green (the decedent) died in New York on April 11, 1976.

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect at the date of death, and all references to Rules are to the Tax Court Rules of Practice and Procedure.

The decedent was a teacher employed by the Board of Education of the City of New York (the city board) and a participant in the City of New York Teachers' Tax Deferred Annuity Program (the annuity program). Pursuant to the annuity program, decedent and the city board entered into an agreement under which amounts were withheld from the decedent's salary and used to purchase a retirement annuity contract. Respondent admits that the amounts withheld were properly excluded from the decedent's gross income under section 403(b), i.e., that the city board purchased the annuity.

An annuity benefit of $28,411.07 was paid pursuant to the annuity contract to a named beneficiary after decedent's death. Petitioner timely filed a Federal estate tax return which included $27,805.44 of the annuity benefit[2] in decedent's gross estate. Subsequently, petitioner filed an amended estate tax return claiming that the annuity benefit was excludable under section 2039(c)(3) and seeking a refund of $8,180.74. A claim for this amount as an overpayment is included in the petition herein.

Public education in New York City is governed, in part, by State statute. The city's educational system is composed of one citywide board of education (the city board) and 32 community school boards; the city board employs a chancellor (in effect, a superintendent of schools). The city board is a corporate body under section 2551 of the New York Education Law. The community boards are creatures of the city board in that the city board defines the boundaries of the community districts and the number of members on each community board. N.Y. Educ. Law sec. 2590-b (McKinney 1981). The city board has sole jurisdiction over the city's high schools (with certain "experimental" exceptions not relevant herein); jurisdiction over the lower schools is split between the city board and the various community school boards. Each community board sets policy for the elementary, intermediate, and junior high schools within its jurisdiction subject to the citywide policies, rules, and regulations of the city board and the chancellor. Any action taken by a community school board is subject to city board policy, and can be appealed in the first instance to the chancellor, and, in the second, to the city board. The

---

[2]Interest of $605.63 earned after death was deducted from the total payment of $28,411.07 to arrive at the amount included in the gross estate.

chancellor has the statutory authority to supersede or suspend a community school board for failing to comply with any applicable law, regulation, directive, or agreement, including those issued by the city board and the chancellor. N.Y. Educ. Law sec. 2590-h (McKinney 1981).

The community school boards' powers are subordinated in many other significant ways to those of the city board. All teachers are hired by the city board and then assigned to the community school districts. The chancellor sets minimum teaching standards for all elementary, intermediate, and junior high school teachers; implementation of such standards and elaboration thereof is the responsibility of the community school boards. The chancellor also mandates, pursuant to city board policy, many educational programs, promotional standards, tests, and evaluations at all levels. All funding received by the community school boards, with the exception of some specific competitive grants which comprise a small percentage of the community school districts' budgets, is allocated directly by the city board. Textbooks are purchased by the community school boards with funds allocated by the city board and from a list which has already been approved by the city board. All school buildings are owned by the city of New York for the benefit of the city school district.

The sole issue for decision is whether the annuity contract purchased for decedent is excludable, under section 2039(c)(3), from decedent's estate. Section 2039(c)(3) provides an exclusion from the gross estate for "the value of an annuity * * * receivable by any beneficiary (other than the executor) under * * * [a] retirement annuity contract purchased for an employee by an employer which is an organization referred to in section 170(b)(1)(A)(ii) or (vi) * * * and which is exempt from tax under section 501(a)." Thus, this annuity benefit is excludable from decedent's estate only if the New York City Board of Education meets the requirements of both section 170(b)(1)(A)(ii) or (vi)[3] and section 501(a).

A section 170(b)(1)(A)(ii) organization is "an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of

---

[3]Neither party has addressed the question of the applicability of sec. 170(b)(1)(A)(vi) herein, and, in view of our disposition of the case, we find it unnecessary to address this question.

pupils or students in attendance at the place where its educational activities are regularly carried on."

Section 501(a) provides, inter alia, that section 501(c)(3) organizations are exempt from taxation. Section 501(c)(3) organizations include—

Corporations, and any community chest, fund, or foundation, organized and operated exclusively for * * * educational purposes * * *, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, * * * and which does not participate in, or intervene in * * * any political campaign on behalf of any candidate for public office.

We first address respondent's argument that the city board is not exempt under section 501(a) because it never "established" its exemption by filing for a determination letter or revenue ruling to that effect. Respondent points to section 1.501(a)–1(a)(2), Income Tax Regs., which provides that—

An organization, other than an employees' trust described in section 401(a), is not exempt from tax merely because it is not organized and operated for profit. In order to establish its exemption, it is necessary that every such organization claiming exemption file an application form * * *

The admonition that an application for exemption must be submitted has been repeated in several revenue rulings. See, e.g., Rev. Rul. 74–15, 1974–1 C.B. 126; Rev. Rul. 67–291, 1967–2 C.B. 184; Rev. Rul. 67–290, 1967–2 C.B. 183; Rev. Rul. 60–384, 1960–2 C.B. 172.

In *Savings Feature of Relief Dept. of B & O R.R. Co. v. Commissioner*, 32 B.T.A. 295 (1935), the Board of Tax Appeals held that "establishment of exemption" language similar to that in section 1.501(a)–1(a)(2), Income Tax Regs., did not require an organization to file proof of its exemption as a condition precedent to the right of exemption. "The penalty for failure to comply seems to be," the Board continued, "that the Commissioner, if he has doubts of the exempt character of any organization, may assess the tax and put that organization to the trouble of proving elsewhere its right to exemption." 32 B.T.A. at 306. Congress interpreted this language in the same way and, in 1969, added section 508 to the Code to make an application for exemption mandatory for most organizations

organized after October 9, 1969. As the House report clearly stated—

Under present law, an organization is exempt under section 501(c)(3) of the code if it meets the requirements of that provision. Although many organizations apply to the Internal Revenue Service for "exemption certificates," the law does not require them to do so. * * * [H. Rept. 91–413, at 37 (1969), 1969–3 C.B. 200, 224. See also S. Rept. 91–552, at 53 (1969), 1969–3 C.B. 423, 458.][4]

The city board was clearly in existence as a corporate body prior to October 9, 1969 (N.Y. Educ. Law sec. 2551 (McKinney 1981)), and respondent's argument that the record herein is silent on the point is without merit.

Respondent also contends that the city board is not "an educational organization which normally maintains a regular faculty and curriculum and normally has a regularly enrolled body of pupils or students in attendance at the place where its educational activities are regularly carried on" (as required by sec. 170(b)(1)(A)(ii)). Respondent's contention is based on the supervisory role the city board exercises vis-à-vis the community school districts; the city board is not, respondent contends, involved in the actual educational activities (the presentation of formal instruction) of a school. To accept respondent's contention would mean that any school system, public or private, with more than one school might be precluded from being classified as a section 170(b)(1)(A)(ii) organization. The city board employed all the teachers in the city's public school system and maintained actual control over the community school districts. The city board's delegation, in the first instance, of many of the day-to-day responsibilities for running the lower and middle schools to the community school districts is due solely to the desire to maximize the effectiveness of the city's educational process. From an examination of the structure and powers of the city board and the community boards, we conclude that the latter are simply creatures of the city board and that the city board is the educational institution

---

[4]The House report also stated, in discussing how sec. 508 would work, that—

"As under present law, the nature of the organization itself—not the determination of the Service—will control in determining whether the organization is exempt. However, unlike present law, an organization may not be exempt under section 501(c)(3) if it fails to make its existence and claimed status known * * * [H. Rept. 91–413, at 38 (1969), 1969–3 C.B. 200, 225. See also S. Rept. 91–552, at 54 (1969), 1969–3 C.B. 423, 459.]"

which controls and operates the schools in the community school districts.

Respondent further argues that the city board is not an organization exempt under section 501(a), because State and local Governments cannot be section 501(c)(3) organizations; New York law·recognizes that education is a State governmental duty (see *Lanza v. Wagner*, 11 N.Y.2d 317, 229 N.Y.S.2d 380 (1962)); all public school education in the State is conducted within the framework of the New York education law; and therefore the activities of the city board constitute the performance of a governmental function and an "integrally related" part of State Government. We are not impressed. In *Estate of Johnson v. Commissioner*, 56 T.C. 944 (1971), acq. 1973–2 C.B. 2, we faced a similar issue when we determined that Iowa State University, which was clearly a creature of the State of Iowa, satisfied the requirement of section 2039(c)(3) that it be "exempt from tax under section 501(a)."[5] We first noted, "There could not be a more fitting description of Iowa State than that provided by section 501(c)(3)." 56 T.C. at 948. We then observed that "from Iowa State's standpoint it is generally irrelevant whether its exemption from taxation is a result of section 501(a) or the broader exemption to which it is entitled as a wholly owned entity of the State of Iowa." 56 T.C. at 948. We rejected respondent's contentions that Congress did not intend State-owned universities to fall within the scope of section 501(a) and that Iowa State was "integrally related" with the State of Iowa and therefore precluded from inclusion within section 501(a). We stated that we could find nothing "attributing to Congress an intent to treat State universities differently than private universities." 56 T.C. at 949. We noted that one of respondent's own revenue rulings (Rev. Rul. 55–319, 1955–1 C.B. 119) could be read as supporting the taxpayer by providing that an organization could be exempt under section 501(c) "regardless of the fact that it also qualifies as a wholly-owned State instrumentality and, as such, would not be subject to Federal income tax." 56 T.C. at 949. With respect to respondent's second contention, regarding integrally related parts of Government, which was expressed

---

[5]Although sec. 2039(c)(3) was worded differently in 1967, the year at issue in *Estate of Johnson v. Commissioner*, 56 T.C. 944 (1971), than in 1976, the year at issue herein, the analysis is the same. See note 9 *infra*.

in Rev. Rul. 60–384, 1960–2 C.B. 172, 173,[6] we observed:

We find it no easy task to draw the distinction so easily made by respondent between a public school, college, university, or hospital that is an *integrally related part of a local government* and one that is *separately organized.* [Emphasis in original.] We think it is a needless exercise in semantics to draw such nebulous lines. *The real question is, and must be, whether the organization, even though State owned, fits within the scope of section 501(c)(3).* [Emphasis added.] Once this question is answered in the affirmative the organization should be dealt with on an equal plane with organizations who must employ section 501(a) to receive tax-exempt status. [56 T.C. at 950.]

We recognize that in *Estate of Johnson v. Commissioner, supra,* we distinguished Rev. Rul. 68–294, 1968–1 C.B. 46, in which respondent ruled that a public school system did not meet the requisite exemption requirement of section 101(b) (which was the same as sec. 2039(c)(3)) because it was an integral part of a local government. See 56 T.C. at 951 n. 3. But we do not view the Court's observations as mandating an acceptance of respondent's position that a school board neces-

---

[6]Rev. Rul. 60–384, 1960–2 C.B. 172, 173, provided in pertinent part as follows:

"Revenue Ruling 55–319 holds, in part, that where an organization desires to have the benefit of a particular tax feature extended to its employees, such as the exemption provided by section 403 of the Code, which depends on exemption under section 501(a) of an employer described in section 501(c)(3), and the particular organization meets the statutory requirements for exemption under section 501(c)(3) of the Code, it may be granted exemption thereunder, regardless of the fact that it also qualifies as a wholly-owned state instrumentality and, as such, would not be subject to Federal income tax.

"Thus, such an organization may be exempt under section 501(c)(3) of the Code if it is organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals.

"A state or municipality itself, however, would not qualify as an organization described in section 501(c)(3) since its purposes are clearly not exclusively those described in section 501(c)(3) of the Code. See for example, *Estate of John C. F. Slayton v. Commissioner,* 3 B.T.A. 1343. It follows, therefore, that where the particular branch or department under whose jurisdiction the activity in question is being conducted is an integral part of a state or municipal government the provisions of section 501(c)(3) would not be applicable. For example, where a public school, college, university or hospital is an integral part of a local government, it could not meet the requirements for exemption under section 501(c)(3) of the Code.

"On the other hand a wholly-owned state or municipal instrumentality which is a counterpart of an organization described in section 501(c)(3) of the Code such as a separately organized school, college, university, or hospital may qualify for exemption under section 501(c)(3) of the Code. If the organization conducting the activity, although a separate entity, is clothed with powers other than those described in section 501(c)(3) it would not be a clear counterpart of a section 501(c)(3) organization. For example, where a wholly-owned state or municipal instrumentality exercises enforcement or regulatory powers in the public interest such as health, welfare, or safety, it would not be a clear counterpart of an organization described in section 501(c)(3) of the Code even though separately organized since it has purposes or powers which are beyond those described in section 501(c)(3)."

sarily is precluded from qualifying as an employer exempt from tax under section 501(a) and therefore meeting the requirement of section 2039(c). We conclude that the mere fact that the city board was discharging a governmental function and may be considered an "integrally related part of a local government" does not, in and of itself, preclude its qualification as an employer "exempt from tax under section 501(a)."

Finally, we turn to respondent's argument that, due to its regulatory, enforcement, and investigative powers, the city board is not a "clear counterpart of a section 501(c)(3) organization" and therefore not "exempt from tax under section 501(a)." We are not convinced that the presence of regulatory and investigative powers, enforceable by legal process, should make the difference where an educational institution which carries on substantially the same activities as a private educational institution is involved and where those powers, as is the case herein, are purely incidental to that institution's educational function. Since the city board is a creature of State law, it is only by specification of State law that the city board can function. That law is comparable to the charter or certificate of incorporation of a private educational institution. The provisions of the New York Education Law which confer the necessary authority upon the city board to fill positions, provide textbooks, and investigate and enforce rules and regulations relating to its operations and functions do no more than put flesh on the bones of the city board. To be sure, included in this authority are various enforcement tools such as the issuance of subpoenas, the conduct of hearings, etc. But these *incidental tools*, some of which may not generally be available to a private educational institution, do not, in our opinion, tip the scales in favor of respondent's position and cause the city board not to be considered a corporation organized and operated exclusively for educational purposes.[7] Cf. Rev. Rul. 74–15, 1974–1 C.B. 126 (public library owned by county not excluded from exempt status by power to set tax rates); Rev. Rul. 67–290, 1967–2 C.B. 183 (power of eminent

---

[7]Respondent has stipulated that the city board's earnings did not inure to the benefit of any private shareholder or individual and that it did not participate or intervene in any political campaign. Respondent did not argue that the city board carried on propaganda activities, or otherwise attempted, to influence legislation in contravention of sec. 501(c)(3), and the record herein affirmatively indicates that it did not do so.

domain not a barrier to exemption of public hospital). The scope of authority granted to the city board may have more pertinence in other areas in determining whether a governmental entity is a "clear counterpart" of a private exempt organization. See, e.g., Rev. Rul. 74–14, 1974–1 C.B. 125 (a public housing authority denied exemption where it was empowered to conduct examinations, carry out investigations, and make recommendations to various enforcement agencies exercising police powers).

In short, we hold that the city board is a sufficient counterpart of a private school system to enable it to satisfy the section 501(a) requirement of section 2039(c)(3).

Our conclusion that the city board meets the tests of section 2039(c)(3) is reinforced by a review of the legislative history of that section and comparable provisions of the Code. Section 2039 was added to the Internal Revenue Code in 1954 to make it clear that certain annuities purchased by decedents' employers were excludable from decedents' gross estates. H. Rept. 1337, 83d Cong., 2d Sess. 90–91 (1954); S. Rept. 1622, 83d Cong., 2d Sess. 123 (1954).

In 1958, the House proposed amendments to section 403 to eliminate a perceived abuse of that section by some tax-exempt organizations; these organizations were paying selected employees, usually part-time employees who derived their principal income from other employment, all, or almost all, of their compensation in the form of tax-deferred annuities.[8] The Senate concurred in the House change and added, inter alia, Code section 2039(c)(3)[9] because it believed that "the other

---

[8]Tax-exempt organizations were able to so compensate their employees because sec. 403 of the original 1954 Code was drafted in such a manner that the requirement that annuities be purchased by qualified nondiscriminatory plans (i.e., those meeting the requirement of sec. 401(a)(3), (4), (5), and (6)) did not apply to them.

The Technical Amendments Act of 1958, Pub. L. 85–866, 72 Stat. 1606, remedied this problem (in sec. 23(a) of the act) by adding a new subsection (b) to sec. 403 which provided in pertinent part that in the case of annuities purchased by sec. 501(c)(3) organizations, if the annuity contract was not purchased under a qualified nondiscriminatory plan, the amount contributed by the employer was excluded from the employee's income in the year of contribution only up to a 20-percent "exclusion allowance" amount.

[9]Sec. 2039(c)(3), as it read in 1958, provided for exclusion of "a retirement annuity contract purchased for an employee by an employer which is an organization referred to in section 503(b)(1), (2), or (3) and which is exempt from tax under section 501(a)." In 1969, Congress amended sec. 2039(c)(3) to require that the organization "be referred to in sec. 170(b)(1)(A)(ii) or (vi), or which is a religious organization (other than a trust), and which is exempt from tax under section 501(a)." Sec. 170(b)(1)(A)(ii) is substantially similar to sec. 503(b)(2) of the 1954 Code as amended and in effect in 1958.

major benefits accorded in the case of industrial plans [including excludability of certain annuities from employees' estates] should also be made available to the educational * * * organizations * * * which maintain a faculty and curriculum and have a regularly enrolled body of pupils in attendance where its educational activities are carried on." S. Rept. 1983, 85th Cong., 2d Sess. 38 (1958), 1958–3 C.B. 922, 959. Both section 2039(c)(3) and section 403(b), as amended, required, in 1958, that the educational organizations be exempt from tax under section 501(a).

To "guarantee" the Code's annuity benefits for their employees, public schools began applying for, and receiving, tax-exempt status under section 501(a). The Internal Revenue Service then qualified the position it took in Rev. Rul. 55–319, 1955–1 C.B. 119, and began ruling that public school employees were not eligible for section 403(b) benefits, because their employers were "integral parts of State and local governments" and, therefore, in the Service's view, not organizations described in section 501(c)(3). See S. Rept. 730, 87th Cong., 1st Sess. 2 (1961), 1961–2 C.B. 466, 467. See also Rev. Rul. 60–384, 1960–2 C.B. 172. As a result, in 1961, Congress amended section 403(b) (see Pub. L. 87–370, 75 Stat. 796, 801) to permit annuity contracts purchased for public school employees to qualify for exclusion from gross income "in the same manner and to the same extent as amounts used to purchase contracts for employees of private organizations described in section 501(c)(3), including private schools." S. Rept. 730, at 2, *supra*, 1961–2 C.B. at 467. The Senate report explained that "It did not seem reasonable to the committee to deny employees of a public school system the same benefit which is allowed employees of tax-exempt organizations when the Congress is prohibited under the Constitution from taxing such State activities."[10] S. Rept. 730, *supra*, 1961–2 C.B. at 467. The

---

[10]In greater detail, the Senate report provided that:

"This amendment will make it unnecessary for public schools or State or local government units to file application with the Commissioner for classification as an organization described in section 501(c)(3) in order for it to purchase employee annuities under section 403(b).

"Moreover, it will clarify the present practice under which some public school bodies have been granted the right to purchase annuity contracts for their employees under section 403(b) while others have been denied the same privilege. Thus, even though a public school, college, or university (including a land-grant college or university) is an integral part of a State or local government (and, therefore, not a sec. 501(c)(3) organization), under the amendment it will meet the requirements of section 403(b). A wholly owned State or municipal instrumentality, such as a

Senate viewed its action as a *clarification of existing law* and, for this reason, made its amendment retroactive to taxable years beginning after December 31, 1957. S. Rept. 730, at 2–3, *supra*, 1961–2 C.B. at 467–468. Neither the Senate nor the House specifically addressed the implications of the Internal Revenue Service's ruling that public schools were not section 501(c)(3)[11] organizations on the applicability of section 2039(c)(3) to public school employees.

Since the language of section 2039(c)(3) and that of section 403(b) were substantially identical in 1961 (see note 9 *supra*), the broad analysis used by the Senate in describing its action can clearly be interpreted as clarifying section 2039(c)(3) as well. Under the foregoing circumstances, we draw no adverse inference from Congress' failure specifically to amend section 2039(c)(3) when it amended section 403(b).[12]

In sum, we hold that the city board is "an organization referred to in section 170(b)(1)(A)(ii)" and "is exempt from tax under section 501(a)." The decedent's annuity therefore meets the requirements of section 2039(c)(3).

Due to concessions and in order to reflect petitioner's claim for an overpayment,

*Decision will be entered under Rule 155.*

---

separately organized school, college, or university, also will qualify.

"The committee felt it was not reasonable to take the view that Congress ever intended that State or local governmental units should be required to file application with the Commissioner for classification as a tax-exempt organization when the Federal Government has no power under the Constitution to tax the State or local government in the first place. * * * [S. Rept. 730, 87th Cong., 1st Sess. 2 (1961), 1961–2 C.B. 466, 467.]"

[11]We recognize that the Senate report, in referring to a "public school" as an "integral part of a State or local government," made a parenthetical reference that the "public school" was "therefore, not a section 501(c)(3) organization." See note 10 *supra*, second paragraph. But this reference was made in the context of commentary on the "present practice" of the Internal Revenue Service and did not represent an independent view of the Committee. We are reinforced in our conclusion on this report by the fact that the entire thrust of the Senate report was that it was "clarifying" the "existing" law by rejecting respondent's position regarding the applicability of sec. 403 to public school employees.

[12]Neither party has advanced any argument herein based upon the legislative history of sec. 403(b) and of sec. 2039(c). Nor was this legislative history considered in *Estate of Johnson v. Commissioner*, 56 T.C. 944 (1971).