COMMISSIONER OF INTERNAL REVENUE *v.*
GILLETTE MOTOR TRANSPORT, INC.

No. 359.   Argued April 21, 1960.—Decided June 27, 1960.

*Wayne G. Barnett* argued the cause for petitioner.
On the brief were *Solicitor General Rankin, Assistant
Attorney General Rice* and *Melvin L. Lebow.*

*Joseph A. Maun* argued the cause for respondent.
With him on the brief was *John A. Murray.*

MR. JUSTICE HARLAN delivered the opinion of the Court.

The question in this case is whether a sum received by
respondent from the United States as compensation for
the temporary taking by the Government of its business
facilities during World War II represented ordinary
income or a capital gain.   The issue involves the con-

struction and application of § 117 (j) of the Internal Revenue Code of 1939.

In 1944, respondent was a common carrier of commodities by motor vehicle. On August 4, 1944, respondent's drivers struck, and it completely ceased to operate. Shortly thereafter, because of the need for respondent's facilities in the transportation of war materiel, the President ordered the Director of the Office of Defense Transportation to "take possession and assume control of" them. The Director assumed possession and control as of August 12, and appointed a Federal Manager, who ordered respondent to resume normal operations. The Federal Manager also announced his intention to leave title to the properties in respondent and to interfere as little as possible in the management of them. Subject to certain orders given by the Federal Manager from time to time, respondent resumed normal operations and continued so to function until the termination of all possession and control by the Government on June 16, 1945.

Pursuant to an Act of Congress creating a Motor Carrier Claims Commission, 62 Stat. 1222, respondent presented its claim for just compensation. The Government contended that there had been no "taking" of respondent's property but only a regulation of it. The Commission, however, determined that by assuming actual possession and control of respondent's facilities, the United States had deprived respondent of the valuable right to determine freely what use was to be made of them. In ascertaining the fair market value of that right, the Commission found that one use to which respondent's facilities could have been put was to rent them out, and that therefore their rental value represented a fair measure of respondent's pecuniary loss. The Commission noted that in other cases of temporary takings, it has typically been held that the market value of what is taken is the sum which would be arrived at by a willing lessor

and a willing lessee. Accordingly, it awarded, and the respondent received in 1952, the sum of $122,926.21, representing the fair rental value of its facilities from August 12, 1944, until June 16, 1945, plus $34,917.78, representing interest on the former sum, or a total of $157,843.99.

The Commissioner of Internal Revenue asserted that the total compensation award represented ordinary income to respondent in 1952. Respondent contended that it constituted an amount received upon an "involuntary conversion" of property used in its trade or business and was therefore taxable as long-term capital gain pursuant to § 117 (j) of the Internal Revenue Code of 1939.*

---

*Section 117 (j) provides as follows:

"Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business—
(1) Definition of property used in the trade or business.

"For the purposes of this subsection, the term 'property used in the trade or business' means property used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (*l*), held for more than 6 months, and real property used in the trade or business, held for more than 6 months, which is not (A) property of a kind which would properly be includible in the inventory of the taxpayer if on hand at the close of the taxable year, or (B) property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business . . . .

"(2) General rule.

"If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered ·as gains and losses from sales or exchanges of capital assets held for more than 6 months. . . ."

The Tax Court, adopting its opinion in *Midwest Motor Express, Inc.*, 27 T. C. 167, aff'd, 251 F. 2d 405 (C. A. 8th Cir.), which involved substantially identical facts, held that the award represented ordinary income. The Court of Appeals, one judge dissenting, in this instance reversed. 265 F. 2d 648. We granted certiorari because of the conflict between the decisions of the two Circuits. 361 U. S. 881.

Respondent stresses that the Motor Carrier Claims Commission, rejecting the Government's contention that only a regulation, rather than a taking, of its facilities had occurred, found that respondent had been deprived of *property,* and awarded compensation therefor. That is indeed true. But the fact that something taken by the Government is property compensable under the Fifth Amendment does not answer the entirely different question whether that thing comes within the capital-gains provisions of the Internal Revenue Code. Rather, it is necessary to determine the precise nature of the property taken. Here the Commission determined that what respondent had been deprived of, and what the Government was obligated to pay for, was the right to determine freely what use to make of its transportation facilities. The measure of compensation adopted reflected the nature of that property right. Given these facts, we turn to the statute.

Section 117 (j), under which respondent claims, is an integral part of the statute's comprehensive treatment of capital gains and losses. Long-established principles govern the application of the more favorable tax rates to long-term capital gains: (1) There must be first, a "capital asset," and second, a "sale or exchange" of that asset (§ 117 (a)); (2) "capital asset" is defined as "property held by the taxpayer," with certain exceptions not here relevant (§ 117 (a)(1)); and (3) for purposes of

calculating gain, the cost or other basis of the property (§ 113 (b)) must be subtracted from the amount realized on the sale or exchange (§ 111 (a)).

Section 117 (j), added by the Revenue Act of 1942, effects no change in the nature of a capital asset. It accomplishes only two main objectives. First, it extends capital-gains treatment to real and depreciable personal property used in the trade or business, the type of property involved in this case. Second, it accords such treatment to involuntary conversions of both capital assets, strictly defined, and property used in the trade or business. Since the net effect of the first change is merely to remove one of the exclusions made to the definition of capital assets in § 117 (a)(1), it seems evident that "property used in the trade or business," to be eligible for capital-gains treatment, must satisfy the same general criteria as govern the definition of capital assets. The second change was apparently required by the fact that this Court had given a narrow construction to the term "sale or exchange." See *Helvering* v. *Flaccus Leather Co.,* 313 U. S. 247. But that change similarly had no effect on the basic notion of what constitutes a capital asset.

While a capital asset is defined in § 117 (a)(1) as "property held by the taxpayer," it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset. This Court has long held that the term "capital asset" is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year. *Burnet* v. *Harmel,* 287 U. S. 103, 106. Thus the Court has held that an unexpired lease, *Hort* v. *Commissioner,* 313 U. S. 28, corn futures, *Corn Products Co.* v. *Commissioner,* 350 U. S. 46,

and oil payment rights, *Commissioner* v. *P. G. Lake, Inc.*, 356 U. S. 260, are not capital assets even though they are concededly "property" interests in the ordinary sense. And see Surrey, Definitional Problems in Capital Gains Taxation, 69 Harv. L. Rev. 985, 987–989 and Note 7.

In the present case, respondent's right to use its transportation facilities was held to be a valuable property right compensable under the requirements of the Fifth Amendment. However, that right was not a capital asset within the meaning of §§ 117 (a)(1) and 117 (j). To be sure, respondent's facilities were themselves property embraceable as capital assets under § 117 (j). Had the Government taken a fee in those facilities, or damaged them physically beyond the ordinary wear and tear incident to normal use, the resulting compensation would no doubt have been treated as gain from the involuntary conversion of capital assets. See, *e. g.*, *Waggoner,* 15 T. C. 496; *Henshaw,* 23 T. C. 176. But here the Government took only the right to determine the use to which those facilities were to be put.

That right is not something in which respondent had any investment, separate and apart from its investment in the physical assets themselves. Respondent suggests no method by which a cost basis could be assigned to the right; yet it is necessary, in determining the amount of gain realized for purposes of § 117, to deduct the basis of the property sold, exchanged, or involuntarily converted from the amount received. § 111 (a). Further, the right is manifestly not of the type which gives rise to the hardship of the realization in one year of an advance in value over cost built up in several years, which is what Congress sought to ameliorate by the capital-gains provisions. See cases cited, *ante,* p. 134. In short, the right to use is not a capital asset, but is simply an incident of the underlying physical property, the recompense for which is commonly regarded as rent. That is precisely the situation here,

and the fact that the transaction was involuntary on respondent's part does not change the nature of the case.

Respondent lays stress on the use of the terms "seizure" and "requisition" in § 117 (j). More specifically, the section refers to the "involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) *of property used in the trade or business and capital assets . . . ."* (Emphasis added.) It is contended that the Government's action in the present case is perhaps the most typical example of a seizure or requisition, and that, therefore, Congress must have intended to treat it as a capital transaction. This argument, however, overlooks the fact that the seizure or requisition must be "of property used in the trade or business [or] capital assets." We have already shown that § 117 (j) does not change the long-standing meaning of those terms and that the property taken by the Government in the present case does not come within them. The words "seizure" and "requisition" are not thereby deprived of effect, since they equally cover instances in which the Government takes a fee or damages or otherwise impairs the value of physical property.

We conclude that the amount paid to respondent as the fair rental value of its facilities from August 12, 1944, to June 16, 1945, represented ordinary income to it. *A fortiori,* the interest on that sum is ordinary income. *Kieselbach* v. *Commissioner,* 317 U. S. 399.

*Reversed.*

Mr. Justice Douglas dissents.