**UNITED STATES of America,**
**Appellant,**

v.

**DRESSER INDUSTRIES, INC., Appellee.**

**No. 20018.**

United States Court of Appeals
Fifth Circuit.

Nov. 6, 1963.

Rehearing Denied Dec. 17, 1963.

William M. Rivkind, Atty., Dept. of Justice, Dallas, Tex., John B. Jones, Jr., Acting Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D. C., H. Barefoot Sanders, U. S. Atty., Dallas, Tex., Michael Smith, David O. Walter, Attys., Dept. of Justice, Washington, D. C., for appellant.

William P. Fonville, Dallas, Tex., for appellee.

Before CAMERON and BROWN, Circuit Judges, and WHITEHURST, District Judge.

CAMERON, Circuit Judge.

This case involves the question whether money received by the taxpayer[1] qualifies for capital gains treatment. The court below held for the taxpayer, awarding judgment in the amount of some ninety thousand dollars, and the government appeals.

The facts underlying this controversy are not in material dispute, most of them being stipulated. Taxpayer owned two patents relating to radioactivity oil well surveying. Well-Surveys, Inc., another party, owned certain patent rights relating to a method and apparatus for logging oil wells. In 1942, it developed a new well surveying method called "Neutron-Gamma Ray Well Logging."

In 1940, Well-Surveys and taxpayer entered into an agreement whereby Well-Surveys granted to taxpayer a license to practice its patent for others, for hire. The agreement described the license given as exclusive, but exempted licenses which had been previously granted to others, and reserved to Well-Surveys the right to practice the patent for hire. Taxpayer agreed to pay to Well-Surveys one-quarter of any fees earned from practice of the patent, and Well-Surveys acquired the right to practice certain of taxpayers' patents. In 1942, the new patent was included in the agreement.

In 1951, Well-Surveys and taxpayer entered into a new agreement. Taxpayer no longer possessed the "exclusive" feature of the grant, and in return Well-Surveys agreed to pay to taxpayer the sum of five hundred thousand dollars, to be paid out of one quarter of the fees earned by practice of the patent to third parties. The sums paid taxpayer under this arrangement are the subject matter of this tax refund action, taxpayer having paid taxes as ordinary income on such sums received, and having brought this action claiming that capital gains treatment was due.

The government contends, first, that the right assigned or transferred in 1951 was not "property" or a "capital asset", but was "nothing more than a substitute for ordinary income to the 'selling' party;" and, second, that "even assuming *arguendo* that a capital asset was here involved, there was no sale or exchange of that asset."

Appellee taxpayer, of course, argues that the *exclusive* right to practice the patent for hire was a capital asset, and that there was a sale or exchange, inasmuch as, at the moment of sale, it had the right and no money and, after the "sale," it had no exclusive right and a claim to money.[2]

The government makes the customary broadside attack on the sale by citing the usual three cases: Corn Products Refining Co. v. Commissioner, 1955, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29; Commissioner v. P. G. Lake, Inc., 1958, 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743; Commissioner v. Gillette Motor Trans-

1. Appellee Dresser Industries, Inc. has succeeded to the claims of its two predecessor corporations. For convenience, it being undisputed that whatever rights there may be now lie in Dresser, we will refer to the corporations simply as "taxpayer."

The years involved are 1953, 1954, 1955 and 1956.

2. Taxpayer relies also on 26 U.S.C.A. § 117(j) (I.R.C.1939) extending capital gains treatment to depreciable trade or business property. We need not discuss this section, however, as our disposition turns on an interpretation of 26 U.S.C.A. § 117(a) (1).

port, Inc., 1960, 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617, attempting to demonstrate that their holdings are dispositive of this case. As we did in Nelson Weaver Realty Co. v. Commissioner, 1962, 5 Cir., 307 F.2d 897, we will distinguish those cases at the threshold:

"In Corn Products * * * the Tax Court, * * * the Court of Appeals, * * * and the Supreme Court found specifically that the taxpayer regularly dealt in corn futures as part of its everyday business operations and they were, therefore, judicially excluded from the definition of capital assets." Nelson Weaver, supra, 307 F.2d at p. 902.

The taxpayer here did not, by any stretch of the imagination, deal regularly with the sale of well surveying patents.

"In Commissioner v. P. G. Lake, Inc., * * * the taxpayer received from the sale of an oil payment an amount exactly equal to the 'face value' of the oil payment transferred, which was expected to and did pay out in slightly more than three years. The interest transferred to the assignee was to terminate after the assignee had received the $600,000.00, the interest which was assigned, plus an amount equal to three percent on the unpaid balance. The seller kept a reversionary interest in the property sold, the purchaser received nothing but a right to payments, which right was to terminate as soon as the $600,-000.00 plus three percent interest was paid. · What was sold, therefore, was the right to receive money in the future, the sales price being almost the exact equivalent of the income which was to be produced in the future." Nelson Weaver, supra, 307 F.2d at p. 902.

The taxpayer here is cutting off a "vertical slice" of its rights, rather than carving out an interest from the totality of its rights under the grant. The in-

terest transferred was not to terminate when a certain amount was paid, as was so in Lake, and taxpayer retained no reversionary interest in the "exclusivity" feature transferred. The tree was sold, along with the fruit, at least insofar as that branch was concerned. Cf. "Assignment of Income: Fruit and Tree as Irrigated by the P. G. Lake Case," 17 Tax Law Review, New York University School of Law, No. 3, March 1962, pp. 293 et seq.

"Gillette Motor Co., * * * involved the question whether the amount received by it as compensation for the temporary taking by the Government of its business facilities for a period of about ten months during World War II constituted ordinary income or capital gain. * * *

"The Motor Carrier Claims Commission allowed in this and all similar cases the fair market value of what was taken, which it held to be nothing more than the use of the facilities entitling Gillette to the fair rental value with interest. * * * *" Nelson Weaver, supra, 307 F.2d at p. 903.

The temporary taking by the government of private facilities merely produced what was, in effect, *rent* which is usually considered ordinary income. The transfer involved here was permanent and final.

■ The government did not, below, raise the first point, that is, that the gain is anticipated future income, and cannot raise it here on appeal for the first time. Nelson Weaver, 307 F.2d at page 903, fn. 6. But we feel that the broad assertion made that, in any case where the purchase price includes anticipated income there can be no capital gains treatment, must be answered. Another panel of this Court, in the case of United States v. Eidson, 1962, 5 Cir., 310 F.2d 111,[3] accepted literally the Supreme Court's generalization in Lake, supra, 356 U.S.

---

3. And cf. Bisbee-Baldwin v. Tomlinson, 5 Cir., 1963, 320 F.2d 929.

p. 266, 78 S.Ct. p. 695, 2 L.Ed.2d 743: "The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property.", to mean that any money paid which represents the present value of future income to be earned is always taxed as ordinary gains. As a legal or economic position, this cannot be so. The only commercial value of any property is the present worth of future earnings or usefulness. If the expectation of earnings of stock rises, the market value of the stock may rise; at least a part of this increase in price is attributable to the expectation of increased income. The value of a vending machine, as metal and plastic, is almost nil; its value arises from the fact that it will produce income.

At common law, the right to receive income from land was ownership of the land. Lord Coke said: "If a man seized of land in fee by his deed granteth to another the profits of these lands, to have and to hold to him and his heirs, and maketh livery *secundum forman chartae,* the whole land itself doth pass. *For what is land but the profits thereof?*" Co.Lit. 45. [Emphasis added.]

There is, in law and fact, a vast difference between the present sale of the future right to *earn* income and the present sale of the future right to *earned* income.[4] If an asset will not in the future be useful, or capable of earning income, it is worthless in the business world.

We conclude, therefore, that the sale was not merely the present sale of the right to earned income, to be paid in the future. Taxpayer had an asset, a right, a property which would produce income. The fact that the income which *could* be earned would be ordinary income is immaterial; such would be true of the sale of all income-producing prop-

erty. See Commissioner v. Ferrer, 1962, 2 Cir., 304 F.2d 125, especially the discussion beginning in the last paragraph on page 132 [304 F.2d on page 132].

We readily distinguish Wiseman v. Halliburton Oil Well Cementing Co., 10 Cir., 1962, 301 F.2d 654, relied on by the government. Although the facts appear similar, it is plain that, in that case, the taxpayer had the right to sublicense the patent to third parties for a fee. He gave up that right in return for a share of royalties received by the patent owner from licenses to be granted to third parties. That is not the case here, inasmuch as taxpayer had no right to allow other parties to practice the patent. Perhaps in Halliburton the taxpayer merely substituted the right to receive ordinary income from one source for the right to receive ordinary income from another; but that is not the case here inasmuch as taxpayer had no right to grant to third parties the right to practice the patent.

The second question is whether there was a sale or exchange of property, rather than merely a "termination" or "relinquishment." It is plain that before the transaction, taxpayer had a right in property; after the transaction was consummated, it no longer had this right, but a claim to money. If the transaction had been with a third party rather than the original patent holder, there would be no question but that a "transfer" was made. We see no difference. Commissioner v. Ray, 5 Cir., 1954, 210 F.2d 390; Commissioner v. Ferrer, supra. In Ray, a no-competition clause in a real estate lease was the subject of the "sale or exchange." We quote a portion of our opinion in that case (210 F.2d pp. 391–392), which we think applies equally here:

" 'A sale in the ordinary sense is a transfer of property for a fixed price in money or its equivalent. Examine the circumstances here, the precedent condition, the transaction and the subsequent condition. Before the transaction the taxpayer had a valuable property right, intangible

4. But see Roscoe v. Commissioner, 5 Cir., 1954, 215 F.2d 478.

but nonetheless property, a restrictive covenant in his lease [imposing a servitude on the property] which prevented competition in his trade or business. Before the transaction [which freed the property from this servitude] the lessor lacked a valuable right, the right to lease its premises to whomsoever it chose upon whatever terms it could arrange [and to sell it free of the servitude]. True, it had once possessed this right, but it had conveyed the right for a consideration to the taxpayer. In the transaction the lessor gave its $20,000 to the taxpayer and in exchange the taxpayer gave to the lessor what it had not immediately theretofore possessed, the right to lease its premises to whomsoever it chose at whatever terms it could arrange.

" 'The Commissioner's position apparently depends upon a view that the restrictive covenant when transferred or released to the covenantor simply disappears, vanishes and becomes nothing and, therefore, cannot be the subject of a sale. The concept, it seems, overlooks the substantial fact that it is the right freely to lease that is the subject of the transaction. Intangible though the property may be, it is real and valuable to both parties to the transaction [a servitude imposed by] a restrictive covenant in the hands of the taxpayer, [an unburdened], a freely exercisable right in the hands of the lessor. The Commissioner's view conceives the covenant as the thing and ignores the status of the intangible right [the servitude it imposes] involved as the substance of the sale. * * * In the commissioner's view property rights which disappear or, as he expresses it, vanish upon a relinquishment, surrender or transfer cannot be the subject of a sale even though the transfer or surrender or relinquishment for a consideration is that which, [by reuniting servient and dominant estate] effects the vanishment. There is much authority to the contrary [of these views].'

"We agree with the respondents' reasoning and with that of the authorities upon which they rely. We particularly agree with what is said in the opinion of the Tax Court and in that of the Court of Appeals in the Golonsky case, Commissioner v. Golonsky, 3 Cir., 200 F.2d 72. Because we do and because the opinions in those cases have, we think, not only correctly determined the issue presented here, but adequately set out the correct reasons for that determination, we will not attempt to restate those reasons. We will content ourselves with saying that, for the reasons advanced in those opinions, the decision and order of the Tax Court was right and it is affirmed."

Commissioner v. Starr Bros., Inc., 2 Cir., 1953, 204 F.2d 673, which held that a release of an exclusive sales agency was not a sale or exchange, has been repudiated by the Second Circuit in Commissioner v. Ferrer, supra. We agree with the Second Circuit's disposition of the problem in Ferrer and adhere to the position taken by us in Ray.

The government's argument, running all through its brief, that capital gains treatment should not be allowed because the reason for the preferential treatment given capital gains [5] is not present, if at all relevant, ignores the fact that the valuable right transferred by taxpayer

---

5. "The preferential treatment of profits as capital gains is a statutory exception to the usual treatment of such profits as ordinary income, and, therefore, the statute must be strictly construed. The purpose of the excepting statute is to ameliorate tax burdens on gains accruing over a substantial period of time and realized in one particular year upon the conversion of a capital investment; it has no application where future ordinary income is anticipated, as in this case." Quoted from the Government's brief.

back to Well-Surveys, Inc. did build up over a period of years. What increased in this case, over those years, was the value of the right "exclusively" to practice the patent. When that right was sold back to Well-Surveys, Inc., a capital gain occurred. It should be so taxed.

Affirmed.

JOHN R. BROWN, Circuit Judge (concurring).

I concur fully in the Court's action and opinion. I would add this by way of emphasis.

Running through several of our prior opinions is the asserted concept that capital gains versus ordinary income is to be determined by the status of current earnings were the asset to have remained in the hands of the transferor. On this approach it is reasoned that if the current income would have been taxable ordinary income, then the sales price which represents the substitute for such future earnings is likewise taxable ordinary income.

I think this is both bad economics and faulty law. A person acquires property for one of two, or both reasons. The first is to receive earnings, i. e., income. The other is to hold the property for appreciation resulting from long or short range economic conditions, inflation or the like. Normally, of course, the predominant reason is to acquire the earning capacity represented by the earnings which the property will generate.

Hence it is that among those who trade in corporate securities on established national exchanges or over-the-counter markets, there are recognized rules of thumb by which the present value, hence market price, is determined for a given stock. The same is true in the contemporary, frequent practice of large-scale corporate acquisitions by one corporation of the stock or assets of another corporation. Value—market or sales price—is determined by capitalizing earnings. Whether the formula is the conservative one of 6. or 7 times earnings, or something less, or one considerably more speculative, what the buyer offers is his estimate of the present, discounted value of the future earnings of the assets or enterprise.

But although this sales price is determined by future earnings, and to the seller it takes the place of what he would have received had he continued his ownership, under no stretch of the imagination is it "ordinary income" either in the business world or in the sometimes more weird, tax world. Were this so, then every such sale for a price in excess of cost would entail this analysis and this tax consequence. There would first have to be ascertained what portion of the excess represented the present value of future earnings and what portion represented merely capital appreciation, from enhancement in value caused by inflation, scarcity or the like. Then as a second step, that portion or the excess of sales price representing future earnings would be taxed as ordinary income, the remainder as capital gains.

Conceding that Congress might compel this, that the ubiquitous and voracious tax gatherer might demand it, or that courts might ultimately sustain it, the fact is that as yet none has gone so fast so far. And that is so because of the practical economic realities which are, after all, of dominant significance in tax affairs. Income is one thing. When income, and income alone is sold or transferred, it keeps this status. But when the thing which generates the income is transferred, what is paid and received is not vicarious income, whether viewed from an economic or a tax standpoint. It is, as the economist and the businessman views it, the present, discounted value of its future earnings. If the "thing" generating such future earnings is "property" of a kind which the tax law recognizes as one entitled to capital gains or losses when used in the tax law sense, that present, discounted value is a capital gain, not ordinary income notwithstanding the economic fact that without such capacity to earn "ordinary income" in the hands of its owner the asset would be valueless.

Tax law, by the hand of man, the Acts of Congress, and the doubtful clarification by Judges is complex enough without making it more so through the importation of bad economics. For before we realize it, economics which knows no

law of stare decisis, is infected by poor or bad law to set in train tax consequences because of what Courts have said, not because of what the actualities really are.

On Petition for Rehearing

PER CURIAM.

Upon considering the petition of the appellant for the rehearing of this case en banc, it is ordered and decreed that said petition be and it is denied.

Thereupon, on consideration of appellant's petition for rehearing, it is ordered and decreed that said petition be and it is denied.