112 T.C. No. 15


UNITED STATES TAX COURT


WILLIAM T. GLADDEN AND NICOLE L. GLADDEN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16932-97.          Filed April 15, 1999.


On cross-motions for partial summary judgment,
<u>held</u>, partnership water rights constitute capital
assets.  <u>Held</u>, <u>further</u>, no portion of partnership's tax
basis in land the partnership acquired in 1976 is to be
allocated to the water rights the partnership acquired
in 1983 and relinquished in 1992.


<u>William Louis Raby</u>, <u>Burgess J. William Raby</u>, and

<u>James J. Rossie, Jr.</u>, for petitioners.

<u>Katherine Holmes Ankeny</u>, for respondent.


OPINION

SWIFT, <u>Judge</u>:  This matter is before us on the parties'

motions and cross-motions for partial summary judgment.

In 1993, as investors in a partnership named Saddle Mountain Ranch which owned land in Harquahala Valley, Arizona (the partnership), petitioners received a portion of $28.7 million paid by the Federal Government to certain Harquahala Valley landowners in connection with the landowners' relinquishment of the right each year to receive Colorado River water to irrigate their land (water rights).

Initially, the parties cross-move for partial summary judgment on the issue as to whether the partnership's water rights constitute capital assets. Respondent would treat the partnership's water rights as not rising to the level of capital assets.

If, as a matter of partial summary judgment, we conclude that petitioners' water rights do constitute capital assets, then the parties cross-move for partial summary judgment on the issue as to whether the funds should be regarded as having been received in a sale or exchange for the water rights so as to qualify the funds received as capital gain income.

If each of the above issues is resolved in favor of petitioners, the parties cross-move for partial summary judgment on the issue as to whether any of the partnership's approximate $675,000 tax basis in its ownership interest in Harquahala Valley land is allocable to and would offset funds received for the water rights.

If each of the above issues is resolved in favor of petitioners, petitioners then move for partial summary judgment

on the issue as to how much of the partnership's tax basis in the land is allocable to the water rights. Petitioners contend that it would be impossible to allocate any specific portion of the partnership's tax basis in the land to the partnership's water rights, and petitioners therefore contend that the partnership's total tax basis of approximately $675,000 in the land should be allocated to the water rights and should offset the funds the partnership received. Respondent objects to partial summary judgment on this issue on the grounds that material facts remain in dispute as to what portion of the partnership's tax basis in the land should be allocated to the water rights.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue.

Set forth below are the facts relating to the above issues.

When the petition was filed, petitioners resided in Buckeye, Arizona.

In 1928, the Boulder Canyon Project Act, ch. 42, 45 Stat. 1057 (1928), was enacted. This statute relates to use and allocation of lower Colorado River water and is the statute under which the water rights at issue in this case were granted.

In 1963, the Supreme Court decided Arizona v. California, 373 U.S. 546 (1963), and concluded therein, among other things, that the Boulder Canyon Project Act preempted State administration of lower Colorado River water and that under the Boulder Canyon Project Act and administrative rulings of the U.S.

Department of the Interior (Interior Department), Arizona, each year, had claim to 2.8 million acre-feet of Colorado River water.

In 1964, under Ariz. Rev. Stat. Ann. sec. 48-2901 (West 1997), the Harquahala Valley Irrigation District (HID) was formed as an Arizona municipal corporation or political subdivision, and not as a taxable corporation, for the purpose of establishing a local water distribution system in and about Harquahala Valley, Arizona.  With regard specifically to water irrigation districts, under Ariz. Rev. Stat. Ann. sec. 48-2978 (West 1997), it is provided, among other things, that irrigation districts may purchase or acquire water rights, construct, acquire, and purchase canals, ditches, and reservoirs, and distribute water for irrigation purposes.

In 1968, pursuant to the Boulder Canyon Project Act and apparently as a followup to the Supreme Court's decision in Arizona v. California, supra, the Colorado River Basin Project Act (CRBPA), Pub. L. 90-537, 82 Stat. 885 (1968), was enacted, which authorized construction by the Federal Government of the Central Arizona Project (CAP), a system of aqueducts and related facilities for distribution of lower Colorado River water throughout Central Arizona.  Under this statute, Colorado River water that would become available for irrigation of land in Arizona through the CAP distribution system generally was to be made available only to land that had a "recent irrigation history".  CRBPA sec. 304, 82 Stat. 891.

In 1971, under Arizona State law, the Central Arizona Water Conservation District (CAP Water District) was formed as a special water conservation district responsible for operation and maintenance of CAP and for repayment to the Interior Department of construction costs that the Federal Government would incur for construction of the CAP water distribution system.

In 1976, petitioners and other investors formed the Saddle Mountain Ranch partnership (the partnership), and for a cost of approximately $675,000, the partnership acquired an ownership interest in farmland in Harquahala Valley, Maricopa County, Arizona.

On February 10, 1983, the Interior Department allocated to Indian communities, to municipalities and industrial users, and to non-Indian agricultural users including irrigation districts such as HID, rights each year to receive, through the CAP distribution system, up to a specified quantity of Colorado River water. Notice of Final Decision, 48 Fed. Reg. 12446 (Mar. 24, 1983). Under this allocation, HID was granted the right to obtain Colorado River water for redistribution to Harquahala Valley landowners for the purpose of irrigating farmland located within geographic boundaries of the HID water district.

As set forth in the following schedule, the specific quantity of lower Colorado River water to which HID was entitled for the above purpose was 7.67 percent of non-Indian agricultural lower Colorado River water that was available each year:

| Annual Allocation (in Acre-feet) of Available CAP Water | | | |
|---|---|---|---|
| To Indian Use | To Municipal and Industrial Use | To Non-Indian Agricultural Use | Percentage of Non-Indian Agricultural Use Allocated to HID |
| 309,828 | 640,000 | Balance | 7.67 |

On November 18, 1983, a water service subcontract relating to distribution of Colorado River water was entered into between the Interior Department and the CAP Water District, on the one hand, and HID, on the other hand (the Subcontract). The Harquahala Valley landowners were not parties to the Subcontract. The Subcontract provides for the delivery over the course of 50 years by the CAP Water District to HID of the designated quantity of available Colorado River water.

Although Harquahala Valley landowners were not named parties to the Subcontract, the terms of the Subcontract were subject to approval by Harquahala Valley landowners, and only owners of the specified 33,251 acres of "eligible land" referred to in the Subcontract were entitled to receive an allocation of Colorado River water from HID. The partnership's land qualified as part of the eligible acres, and thus under the Subcontract, the partnership was entitled to receive each year from HID a specified quantity of available Colorado River water.

Under the Subcontract and Arizona law, each year the available Colorado River water that was allocated through the CAP Water District to HID and that HID elected to receive from the

CAP Water District was required to be distributed by HID to the Harquahala Valley landowners on a per-acre basis. See Ariz. Rev. Stat. Ann. sec. 48-2990 (West 1997).

The Subcontract does not state that the water rights of Harquahala Valley landowners such as the partnership were appurtenant to the land.

Before the beginning of each year, the CAP Water District would notify HID of the amount of Colorado River water that, under the Subcontract, would be available to HID during the following year, and HID would submit to the CAP Water District a requested monthly water distribution schedule for the following year indicating how much of the available Colorado River water it wished to receive.

Under the Subcontract, HID was required to pay $2 per acre-foot for Colorado River water it received under the above allocation and Subcontract. Over the course of the 50-year term of the Subcontract, the rate of $2 per acre-foot of Colorado River water received was subject to periodic review and adjustment.

Also under the Subcontract, HID was obligated to pay its share of annual operating and maintenance costs of the CAP Water District distribution system.

As Harquahala Valley landowners entitled to and receiving Colorado River water from HID, the landowners, including the partnership herein, were required each year to pay HID for the Colorado River water they received under the above allocation and

Subcontract, at a rate, with certain adjustments, per acre-foot of water pegged to what HID was required to pay the CAP Water District.

Each year, HID, with approval of the CAP Water District could sell or exchange "excess" water (namely, Colorado River water available under the Subcontract that the Harquahala Valley landowners did not wish to receive) but only to landowners within Maricopa, Pinal, and Pima Counties, Arizona. Funds HID realized on sale of excess water, over and above its costs, could not be retained by HID but were required to be paid to the CAP Water District to pay down the debt obligation of HID to the CAP Water District.

The Harquahala Valley landowners could sell their beneficial interests in Colorado River water rights to third parties but only as part of a sale of their ownership interests in the land.

Under the Subcontract, it was provided that all uses of Colorado River water by water districts and landowners to whom the water was allocated and distributed had to be consistent with Federal Government and CAP Water District directives regarding Colorado River water.

Under the Subcontract, the Interior Department retained the right to sell to other water districts, to landowners, and to others Colorado River water that was not distributed to those with specific allocations under the Subcontract.

In 1984, HID contracted with the Interior Department for construction of a water distribution system in and about

Harquahala Valley, Arizona (local water distribution system), that would connect with the CAP Colorado River water distribution system. HID issued $8.4 million in municipal bonds to raise funds to reimburse the Interior Department for a portion of construction costs the Interior Department had advanced for construction of the local water distribution system.

During 1983 through July of 1992, HID and the Harquahala Valley landowners received annual distributions of Colorado River water under the Subcontract.

On July 17, 1992, HID sent a written notice to the Harquahala Valley landowners of a special election regarding relinquishment of HID's water rights under the Subcontract. The notice explained that HID's proposed relinquishment of water rights would occur in exchange for payment by the Federal Government to HID of HID's debt and bond obligations to the Federal Government and for the payment of other funds. The notice further explained that funds HID would have available as a result of the payment for relinquishment of its water rights, after expenses and debts, could be distributed to the Harquahala Valley landowners.

On August 7, 1992, HID and the Federal Government signed an agreement in principle under which HID agreed to relinquish up to 100 percent of its Colorado River water rights, and the value of the water rights to be relinquished was agreed to be $1,050 per acre-foot of water.

On August 11, 1992, the Harquahala Valley landowners, including the partnership, held an election in which they approved relinquishment by HID of the Colorado River water rights under the Subcontract.

On December 1, 1992, a final agreement (Master Agreement) was entered into between the Interior Department and HID for relinquishment or termination of HID's water rights under the Subcontract. Thereunder, HID relinquished to the Interior Department its rights under the above 1983 water supply Subcontract to receive over the course of the next 40 or more years Colorado River water, and the Interior Department agreed to discharge HID's debt to the Federal Government in relation to the construction of the local water distribution system and to pay HID $28.7 million.

The Master Agreement acknowledged that the terms and conditions under which HID relinquished its Colorado River water rights were approved by the Harquahala Valley landowners.

The Master Agreement provided that, in entering into the agreement, HID was acting in its capacity as a municipal corporation of the State of Arizona and that there existed no third-party beneficiaries to the Agreement.

Under the July 17, 1992, notice to the landowners and under the Master Agreement, landowners who did not agree to relinquishment of their water rights had the option to continue to receive Colorado River water under the 1983 Subcontract.

Thus, if petitioners' partnership or if any of the other Harquahala Valley landowners had not agreed to relinquishment of the water rights, HID could not have disposed of the water rights relating to the land of the objecting landowners.

Apparently, one Harquahala Valley landowner voted against relinquishment of the water rights, but the record does not disclose the subsequent history of that landowner and its receipt of Colorado River water.

In late 1992, in exchange for relinquishment of its Colorado River water rights, HID received $28.7 million from the Interior Department.

On January 5, 1993, HID's board of directors met and authorized distribution of $24.6 million to the Harquahala Valley landowners who had approved relinquishment of the water rights. As part of the distribution that occurred, petitioners' partnership received $1,088,132.

Upon receipt of the above funds, each Harquahala Valley landowner entered into a distribution agreement and release (Distribution Agreement) with HID under which it was provided that the landowners would return to HID any "relinquishment funds" they received if an error in payment occurred or if HID incurred a liability necessitating the use of the funds.

There is no express provision in the Distribution Agreement indicating that the distribution occurred in exchange for any right of the landowners in Colorado River water.

At the time of the 1992 Master Agreement, the local water distribution system that was connected to CAP and that was maintained by HID was complete. HID agreed to continue to maintain and operate this water distribution system in subsequent years, by purchasing water on the open market and distributing and selling water to the Harquahala Valley landowners and to others as the landowners and others decided to purchase water from HID at market rates. The CAP Water District was one of the sources from which HID might purchase water in subsequent years, depending on the price of water available through CAP in comparison to the price of water available from other sources.

After relinquishment to the Interior Department of the water rights by the Harquahala Valley landowners, the water rights were reallocated to other users of Colorado River water.

On March 21, 1994, the Inspector General of the Interior Department issued an audit report regarding the Master Agreement and relinquishment by HID of its Colorado River water rights. This report faulted the Interior Department in the negotiations relating to relinquishment of HID's water rights and for discounting the value of HID's debt obligation to the Federal Government to a present value (as of the end of 1992) of $5.8 million, which was factored into the computation of the payment to HID of $28.7 million. This report also stated that the Harquahala Valley landowners "unduly benefited" by receipt of $24.6 million in connection with relinquishment of the water rights.

On June 5, 1995, the U.S. General Accounting Office issued a report to a congressional committee regarding relinquishment by HID to the Interior Department of its Harquahala Valley water rights. Therein, that transaction is described as a "sale of a water entitlement" by the Harquahala Valley landowners.

## Discussion

### Capital Asset Treatment of Water Rights

As explained, petitioners contend, as a matter of law and partial summary judgment, that the water rights of the partnership constitute capital assets and that relinquishment thereof by the partnership constituted a sale or exchange. Respondent contends, also as a matter of law and partial summary judgment, that relinquishment by the partnership of water rights did not constitute a sale or exchange of a capital asset and therefore that the $1,088,132 the partnership received in 1993 should be treated as ordinary income.

In order for contract rights to qualify as capital assets under section 1221, the contract rights must constitute "property" of the taxpayer and not constitute any of the five types of property excluded from capital gain treatment under section 1221(1) through (5) (namely, (1) inventory; (2) depreciable personal property or real property used in a trade or business; (3) certain intangible property; (4) accounts

receivable acquired in a trade or business; and (5) certain governmental publications).[1]

---

[1] Sec. 1221 provides as follows:

SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include--

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by--

(A) a taxpayer whose personal efforts created such property,

(B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or

(C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1);

(5) a publication of the United States Government
(continued...)

Neither party herein suggests that any of the above five statutory exceptions applies to the water rights in issue. Petitioners, in their briefs, note that if the water rights in issue were to be treated as "real property" used in the trade or business of the partnership's farming activity, and therefore as excluded from capital asset treatment under section 1221, gain realized on the sale of the water rights would, in any event, be treated as capital gain under section 1231. Neither party, however, pursues this possible treatment of the partnership's water rights as section 1231 "real property". Thus, the only question before us is whether the partnership's water rights constitute "property" and capital assets under section 1221.[2]

---

[1](...continued)

(including the Congressional Record) which is received from the United States Government or any agency thereof, other than by purchase at the price at which it is offered for sale to the public, and which is held by--

(A) a taxpayer who so received such publication, or

(B) a taxpayer in whose hands the basis of such publication is determined, for purposes of determining gain from a sale or exchange, in whole or in part by reference to the basis of such publication in the hands of a taxpayer described in subparagraph (A).

[2] The fact that the water rights involved herein constitute surface water rights, rather than in situ water rights, may explain why petitioners do not argue that the water rights qualify as "real property" and therefore qualify for capital gain treatment under sec. 1231.

The policy considerations and rule of construction concerning what constitutes capital assets have been explained as follows:

> The preferential treatment afforded by the capital gains provisions, 26 U.S.C.A. secs. 1201-1202, 1221-1223, was designed "to relieve the taxpayer from * * * excessive tax burdens on gains resulting from a conversion of capital investment * * *." Burnet v. Harmel, 287 U.S. 103, 106, 53 S.Ct. 74, 75, 77 L.Ed. 199. In Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 134, 80 S.Ct. 1497, 1500, 4 L.Ed.2d 1617, the Court held that it was "the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." Commissioner of Internal Revenue v. P.G. Lake, Inc., supra; Burnet v. Harmel, supra. * * * [Wiseman v. Halliburton Oil Well Cementing Co., 301 F.2d 654, 658 (10th Cir. 1962).]

See also Freese v. United States, 455 F.2d 1146, 1150 (10th Cir. 1972); Elliott v. United States, 431 F.2d 1149, 1155 (10th Cir. 1970).

As we have previously explained, see Foy v. Commissioner, 84 T.C. 50, 65-70 (1985), no single definitive explanation is available of what types of property qualify as capital assets under section 1221.

Over the years, court decisions have recognized limitations on the types of property which qualify as capital assets under section 1221. In Corn Prods. Ref. Co. v. Commissioner, 350 U.S. 46, 51 (1955), assets that were an integral part of a taxpayer's business were held not to qualify as capital assets. In that

case, the Supreme Court held that although corn futures contracts did not fall expressly within the statutory exclusions, profits received from the purchase and sale of futures contracts entered into in order to assure a reasonably priced supply of corn inventory for the taxpayer's business did not qualify for capital gain treatment. The Court observed that "Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss." Id. at 52.

In 1988, in Arkansas Best Corp. v. Commissioner, 485 U.S. 212, 219 (1988), the Supreme Court clarified that the Corn Prods. judicial exception is more properly interpreted as involving an application of the statutory exception for inventory under section 1221(1). See also FNMA v. Commissioner, 100 T.C. 541, 573 (1993). As explained, respondent does not contend that petitioners' contract rights fall within the inventory exception to capital asset treatment.

Another limitation on the types of property which qualify for treatment as capital assets was explained by the Supreme Court in Commissioner v. P.G. Lake, Inc., 356 U.S. 269 (1958). Thereunder, a mere right to receive ordinary income generally will not qualify as a capital asset. The issue in Commissioner v. P.G. Lake, Inc., supra, was whether a transfer of royalty rights associated with the production of oil constituted sale of a capital asset. After the transfer, the taxpayer retained a reversionary interest in the underlying oil and gas leases, and

the purchaser acquired nothing more than a right to receive a portion of the royalties for a limited time. The Supreme Court noted that the amount received for the transfer was virtually equivalent to the amount of royalty income that otherwise would have been received. The Supreme Court concluded that the only right the taxpayer sold was the right to receive ordinary income and held that the royalty right did not constitute a capital asset. The Supreme Court noted as follows:

> The substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property. [Id. at 266.]

Subsequent decisions have attempted to clarify the holding of the Supreme Court in P.G. Lake, Inc. With respect to the broad proposition that amounts received for the transfer of a right to receive future income will not qualify for capital gain treatment, the Court of Appeals for the Fifth Circuit in United States v. Dresser Indus., Inc., 324 F.2d 56 (5th Cir. 1963), explained--

> As a legal or economic position, this cannot be so. The only commercial value of any property is the present worth of future earnings or usefulness. If the expectation of earnings of stock rises, the market value of the stock may rise; at least a part of this increase in price is attributable to the expectation of increased income. The value of a vending machine, as metal and plastic, is almost nil; its value arises from the fact that it will produce income. [Id. at 59.]

In applying the P.G. Lake, Inc. limitation on what property qualifies as a capital asset, courts generally consider the entire economics of a transaction, as suggested by Dresser Indus., Inc. in the above quotation, and evaluate all of the rights of the taxpayer, as well as all of the risks and obligations of the taxpayer associated with ownership of the property before the transfer.  For example, in an attempt to explain P.G. Lake, Inc., we stated in Guggenheim v. Commissioner, 46 T.C. 559 (1966)--

> The Court in Lake was faced with the problem whether a transfer of part of a capital asset is itself the transfer of a capital asset.  That part was defined and delineated by the taxpayer in such a manner as to consist essentially of only the rights to income.  The transferee assumed few of the risks identified with the holding of a capital asset; he assumed only a nominal risk of his oil payment right decreasing in value and none of the possibility of the oil payment right increasing in value.  On the other hand, the taxpayer, after the transfer, retained essentially all of the investment risks involved in his greater interest to the same extent as before the transfer.  [Id. at 569.]

The above statement implies that whether investment risks are associated with contract rights transferred is a particularly relevant consideration in determining whether the rights are to be treated as capital assets.

In Commissioner v. Ferrer, 304 F.2d 125, 130 (2d Cir. 1962), revg. in part and remanding 35 T.C. 617 (1961), the Court of Appeals for the Second Circuit concluded, among other things, that where a taxpayer's "bundle of rights" reflected "something more than an opportunity, afforded by contract, to obtain

periodic receipts of income," and where they included "equitable interests" similar to those of an owner of property, they were to be treated as capital assets.

The basic proposition of <u>Commissioner v. P.G. Lake, Inc.</u>, <u>supra</u> at 265, is still viable. Where a taxpayer merely "[substitutes] the right to receive ordinary income from one source for the right to receive ordinary income from another [source]," the rights transferred will not be considered a capital asset. <u>United States v. Dresser Indus., Inc.</u>, <u>supra</u> at 59; see also <u>Arkansas Best Corp. v. Commissioner</u>, <u>supra</u> at 217 n.5.

To summarize, in determining whether a taxpayer's contract rights that are transferred constitute capital assets, courts generally consider all aspects of the taxpayer's bundle of rights and responsibilities that are transferred, specifically including the following six factors:

(1) How the contract rights originated;

(2) How the contract rights were acquired;

(3) Whether the contract rights represented an equitable interest in property which itself constituted a capital asset;

(4) Whether the transfer of contract rights merely substituted the source from which the taxpayer otherwise would have received ordinary income;

(5) Whether significant investment risks were associated with the contract rights and, if so, whether they were included in the transfer; and

(6) Whether the contract rights primarily represented compensation for personal services. [Foy v. Commissioner, 84 T.C. at 70.]

Both parties herein rely on certain Supreme Court cases that involve general, nontax issues regarding water rights. See Nevada v. United States, 463 U.S. 110 (1983); Ickes v. Fox, 300 U.S. 82 (1937). At issue in Nevada were rights of landowners to water from the Truckee River in Nevada. At issue in Ickes were rights of landowners to water from the Sunnyside Unit of the Yakima Project in Washington. The water rights in both cases were based on the Reclamation Act, ch. 1093, 32 Stat. 388 (1902).

In Nevada v. United States, supra at 126, the Supreme Court explained that "the beneficial interest in the rights confirmed to the Government resided in the owners of the land within the Project to which these water rights became appurtenant upon the application of Project water to the land," and that "the law of Nevada, in common with most other western States, requires for the perfection of a water right for agricultural purposes that the water must be beneficially used by actual application on the land."

In Ickes v. Fox, supra at 94-95, the Supreme Court stated:

Although the government diverted, stored and distributed the water, the contention of petitioner that thereby ownership of the water or water-rights became vested in the United States is not well founded. Appropriation was made not for the use of the government, but, under the Reclamation Act, for the use of the land owners; and by the terms of the law and of the contract already referred to, the water-rights became the property of the land owners, wholly distinct

from the property right of the government in the
irrigation works.  * * *

As stated, the water rights and allocations involved in both
Nevada and Ickes were based on the Reclamation Act passed by
Congress in 1902.  Thereunder, it was expressly provided that
"the right to the use of water acquired under the provisions of
this Act shall be appurtenant to the land irrigated, and
beneficial use shall be the basis, the measure, and the limit of
the right."  Ch. 1093, sec. 8, 32 Stat. 390.

Consistently with the above statutory language, the
underlying contracts involved in Nevada between the U.S.
Government and the landowners provided generally "for a permanent
water right for the irrigation of and to be appurtenant to all of
the irrigable area now or hereafter developed under the [Newlands
Reclamation Project]".  Nevada v. United States, supra at 127
n.9.  Similarly, the underlying contracts involved in Ickes
between the U.S. Government and the landowners provided generally
that the "rights shall be, and thereafter continue to be, forever
appurtenant to designated lands owned by such shareholders."
Ickes v. Fox, supra at 89.

Petitioners argue that the above language from Nevada and
Ickes supports a conclusion that the Harquahala Valley
landowners' water rights under the Subcontract were appurtenant
to the landowners' land.

Respondent relies on the same cases and emphasizes
differences in the relevant Federal law and the underlying

contracts that were involved in those cases and in the Boulder Canyon Project Act that is involved in the instant case.

We now apply the law, as set forth and discussed above, to the undisputed facts of this case. The participation and rights of the partnership in which petitioners invested in Colorado River water originated in 1983 only as a result of and in direct proportion to the partnership's ownership interest in Harquahala Valley land. The 1983 allocation of water rights to HID under the Subcontract and through HID to the partnership under Arizona law was directly linked to and dependent upon the partnership's ownership of the land and on irrigation of the land in prior years.

Ariz. Rev. Stat. Ann. sec. 48-2990, relating to water rights and irrigation districts, and under which the partnership in 1983 received its Colorado River water rights, provides in part as follows: "Subject to the law of priority, all water of the district available for distribution shall be apportioned to the lands thereof pro rata".

The water rights of the partnership were linked to the partnership's ownership interest in the land, to its farming operations and activities on the land, and to its capital investment in the land. The water rights, and particularly the decision in 1992 to relinquish the water rights, affected the partnership's farming activity and the investment risks associated with that farming activity--especially the financial risks associated with purchasing water on the open market.

From 1983 through 1992, use of the water rights did not produce for the partnership, in any direct or immediate sense, ordinary income.  Rather, using water received, land was planted, fertilized, and irrigated.  Crops grew.  Eventually, crops were harvested, transported, and sold.  The water rights at issue simply represent one component of the partnership's investment in and operation of its farming activity.

Certainly, the $1,088,132 the partnership received in 1993 upon relinquishment of the water rights did not represent merely a substitute for ordinary income the partnership otherwise would have received.  Rather, it represented payments the partnership received in exchange for making a shift in one significant aspect of its farming activity; i.e., a shift in the source of its irrigation water from the Colorado River at fixed prices to the market place at market prices.

The above undisputed facts surrounding the origination, allocation, and use of the water rights support the conclusion that the partnership's water rights should be treated as capital assets.  We so hold.

In spite of differences between the language of the Reclamation Act, involved in Nevada v. United States, supra, and Ickes v. Fox, supra, and the language of the Boulder Canyon Project Act, involved in the instant case, we agree generally with petitioners that such differences in the underlying statutory language and in the above nontax opinions of the Supreme Court do not support a conclusion that the water rights

involved herein do not constitute capital assets of the partnership. To the contrary, as we read the above authority, we believe they support the conclusion that the water rights allocated to the partnership for use in its farming activity, constitute contractual rights that are to be regarded as integral to the partnership's farming activity (whether technically appurtenant to the land or not) and as capital assets of the partnership.

Respondent acknowledges that the water rights of HID constitute capital assets. For purposes of analyzing the capital asset character of the water rights, we perceive little difference between HID's rights in Colorado River water and the allocations the partnership received through the HID in Colorado River water. We note, in particular, Ariz. Rev. Stat. Ann. sec. 48-2990, under which water districts must distribute all water available for distribution "to the lands thereof pro rata", and Ariz. Rev. Stat. Ann. sec. 48-2902 (West 1997), under which water districts are not allowed to divert allocated water from landowners having a prior right to such water to other purposes without first compensating the landowners.

Lastly, we note that respondent's rulings often treat as capital assets allocations or rights that taxpayers receive from governmental agencies. See Rev. Rul. 66-58, 1966-1 C.B. 186 (cotton acreage allotments treated as capital assets); Rev. Rul. 70-644, 1970-2 C.B. 167 (milk allocation rights treated as capital assets); see also Madera Irrigation Dist. v. Hancock, 985

F.2d 1397, 1401 (9th Cir. 1993) (the parties and the Court of Appeals for the Ninth Circuit treated water rights as property rights protected by the Fifth Amendment); First Victoria Natl. Bank v. United States, 620 F.2d 1096, 1106-1107 (5th Cir. 1980) (rice production histories and rights to receive allotments of rice, if and when issued, were treated as property rights includable in a decedent's gross estate).

On this issue, we grant petitioners' motion for partial summary judgment, and we deny respondent's motion for partial summary judgment.

Sale or Exchange

If petitioners' water rights in Colorado River water are to be treated as capital assets, petitioners and respondent cross-move for partial summary judgment on the issue of whether, for Federal income tax purposes, relinquishment of the water rights by the partnership and receipt of $1,088,132 by the partnership constituted a sale or exchange. Respondent contends that the $1,088,132 was transferred to the partnership either for the partnership's commitment to indemnify HID for unexpected future liabilities that might arise or as a mere windfall distribution to the partnership of HID surplus funds.

The undisputed evidence establishes that the form and substance of the transfers of funds that occurred at both levels (from CAP to HID and from HID to the partnership) were based on and occurred as a result of the partnership's relinquishment or

exchange of rights to Colorado River water. Respondent's contention that the transfer of funds from HID to the partnership did not constitute a sale or exchange but was based on some indemnification commitment or windfall distribution of surplus funds ignores the substance of the transaction by which the partnership relinquished its water rights in return for the $1,088,132.

The mere reference in the 1993 Distribution Agreement to a boilerplate and routine indemnification commitment and to the possibility that the landowners might be required to return to HID some portion of the funds received does not control the treatment of the transaction.

The funds were labeled "relinquishment funds", and that is what the funds constituted. The funds were received in exchange for relinquishment of the water rights. They were not labeled and they did not constitute indemnification funds, surplus funds, or windfall funds.

Respondent argues that HID was not required to distribute any of the funds to the partnership. Assuming arguendo that respondent is correct, the significant facts are that HID did distribute those funds to the partnership and that HID did so only in exchange for relinquishment of the partnership's water rights.

Respondent notes that the partnership and other Harquahala Valley landowners were not named parties to the Master Agreement, that under the Master Agreement no third-party beneficiaries were

provided for, and that under the Distribution Agreement it was not expressly provided that relinquishment of the water rights occurred "in exchange" for the funds distributed.

Respondent's arguments are without merit. The transaction before us constitutes a sale or exchange by the partnership of water rights for the $1,088,132 received by the partnership.[3]

We grant petitioners' motion for partial summary judgment on this issue.

### Allocation of Partnership's Tax Basis in Land to $1,088,132 Partnership Received for Water Rights

If the above issues are resolved in favor of petitioners, as they are, petitioners and respondent cross-move for partial summary judgment on the issue as to whether any portion of the partnership's $675,000 tax basis in its ownership interest in Harquahala Valley land is allocable to the water rights and should be available to offset the $1,088,132 the partnership received in 1993 upon relinquishment of the water rights.

Petitioners contend that under the 1983 Subcontract and under Arizona State law, the partnership's water rights constituted part of the bundle of rights represented by land

---

[3]   We note that neither party relies on court opinions involving so-called vanishing or disappearing assets. See, e.g., Nahey v. Commissioner, 111 T.C. 256 (1998); Towers v. Commissioner, 24 T.C. 199 (1955), affd. 247 F.2d 233 (2d Cir. 1957); Hudson v. Commissioner, 20 T.C. 734 (1953), affd. per curiam sub nom. Ogilvie v. Commissioner, 216 F.2d 748 (6th Cir. 1954). Because the water rights that HID and the partnership relinquished to the Interior Department reverted to the Interior Department, survived, and were reallocated to other users, those opinions would appear inapplicable to the instant controversy.

ownership that the partnership held, that the water rights could be neither bought nor sold separately by the partnership, and therefore that the partnership's $675,000 cost of purchasing the land in 1976 should be applied against the $1,088,132 the partnership received in 1993 on relinquishment of the water rights.

Because the water rights were received and sold by the partnership separately from the land, respondent argues that no allocation should be allowed of the partnership's land costs to the funds the partnership received for the water rights.

For Federal income tax purposes, the general rule provides that taxpayers recover tax free their cost or tax basis for property on which gain is to be computed. See sec. 1001(a). Section 1016(a)(1) provides in pertinent part that--

adjustment * * * [to basis shall be made]

(1) for expenditures, receipts, losses, or other items, properly chargeable to capital account * * *

Petitioners contend that under section 1016, where property that is sold does not have a separate, identifiable cost or tax basis and where the property sold is sufficiently integrated with or appurtenant to related property, the taxpayer's total cost for the related property should be charged to the transaction and only after the taxpayer's total cost for the related property is recovered should the taxpayer be required to recognize any taxable capital gain on the property sold.

More specifically with regard to the facts of this case, petitioners contend that in 1976 when the partnership acquired its interest in Harquahala Valley land, the partnership simultaneously acquired an expectation of future water rights and that the water rights that were acquired by the partnership in 1983 should be regarded as sufficiently related to or appurtenant to the land to justify allocating the partnership's 1976 $675,000 cost of purchasing the land to the $1,088,132 the partnership received in 1993 upon relinquishment of the water rights.

The facts relevant to this issue are clear, and on this issue, neither party suggests any material facts in dispute. In 1976, when it acquired its interest in Harquahala Valley land, and thereafter until 1983, the partnership did not have vested property rights in Colorado River water.

In 1983, the partnership acquired, and in 1992, the partnership relinquished, Colorado River water rights separately from any acquisition or sale of its ownership interest in the land. Before 1983, the partnership acquired the land without any vested interest in Colorado River water. After 1992 (after its water rights had been relinquished), the partnership owned the same interest in the same land it acquired in 1976.

On these facts, no portion of the partnership's original land acquisition cost or tax basis in the Harquahala Valley land is properly allocable to the water rights the partnership received in 1983 and sold or relinquished in 1992.

Petitioners and respondent rely on various cases, Arizona law, and other authority. In Inaja Land Co. v. Commissioner, 9 T.C. 727, 736 (1947), because it was impossible to allocate with reasonable accuracy a separate cost to easements the taxpayer sold, the Court allocated the taxpayer's cost of underlying land to funds received on sale of the easements. The taxpayer in Inaja, however, in 1928 had purchased the land not just with an expectation but with a legal right not to have the land flooded from unexpected upstream water sources. In subsequent years, in connection with construction of a tunnel, the taxpayer's land located downstream from the tunnel was flooded, and the responsible government agency paid the taxpayer a lump sum for the easement to flood the taxpayer's land.

In Trunk v. Commissioner, 32 T.C. 1127, 1139 (1959), payments received for relinquishment of a right to a possible condemnation award were treated as received in exchange for a capital asset. We also held that because it was impossible or impracticable to ascertain the taxpayer's specific cost basis for the right that was relinquished, which was derived from the taxpayer's right of ownership in the entire property, the payments received were to be offset by the taxpayer's cost basis in the entire property. In the instant case, however, the partnership's ownership of the land was not acquired with any vested right to Colorado River water. Trunk is distinguishable.

The parties refer to Rev. Rul. 66-58, 1966-1 C.B. at 187, in which the tax treatment of the sale of cotton acreage allotments was addressed.  In the ruling, it is stated that--

Where a taxpayer has acquired * * * [a cotton] allotment along with the land to which it relates, as a unit, the cost or other basis of the entire unit should be allocated between the land and the allotment in accordance with the relative fair market values of such properties on the date of acquisition. * * *

The ruling, however, also explains--

Of course, no portion of the basis of land, acquired prior to the issuance of the cotton allotment, can be allocated to such allotment.

Our discussion of the partnership's water rights in the context of the above capital asset issue (namely, among other things, that water rights the partnership received in 1983 related to and were dependent upon the land the partnership acquired in 1976) is not inconsistent with our analysis and holding on the instant issue that the water rights were sufficiently distinct and separate from the partnership's ownership interest in the land to preclude any allocation of the partnership's cost or tax basis in the land to the partnership's water rights.

The partnership's water rights were related to and dependent upon the partnership's land ownership, and the partnership's water rights constituted capital assets of the partnership.  At the same time, however, as discussed, the partnership's water

rights were received in 1983, years after the land was acquired in 1976, and in a separate transaction.  The partnership then, in 1992, sold the water rights separately from the land and retained the same land it had acquired in 1976.

Impossibility of Allocation of Portion of Tax Basis in Land

If the above issues are resolved in favor of petitioners, petitioners move for partial summary judgment on the issue as to whether, on the facts of this case, it would be impossible to allocate a specific portion of the partnership's total cost or tax basis in its land to the funds the partnership received for the water rights.  Because of the alleged impossibility of allocating any specific portion of the partnership's land cost to the water rights, petitioners, as a matter of summary judgment, would allocate the partnership's total $675,000 tax basis in the land to the $1,088,132 the partnership received for the water rights.

If we address this issue, respondent objects to partial summary judgment on the ground that material facts remain in dispute as to what an appropriate allocation would be of the partnership's tax basis in the land to the funds the partnership received for the water rights.

In light of our conclusion and holding in respondent's favor on the prior issue (viz, that no allocation of the partnership's cost and basis in the land is to be allocated to the water rights), we need not address this issue.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.