T.C. Memo. 1999-336

UNITED STATES TAX COURT

MARGARET HANCOCK, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 20107-97.                    Filed October 7, 1999.

<u>John F. Daniels III</u>, for petitioner.

<u>Doreen M. Susi</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income taxes of $70,132 for 1993 and $63,075 for 1994.

After concessions, the sole issue for decision is whether petitioner's losses from the sale of residential lots of $207,850 in 1993 and $166,599 in 1994 were capital losses, as respondent

contends, or ordinary losses, as petitioner contends. To prevail, petitioner must show that she held the lots for sale to customers in the ordinary course of her trade or business. See sec. 1221(1). We hold that petitioner's losses were ordinary losses.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. Petitioner

Petitioner lived in Scottsdale, Arizona, when she filed the petition in this case. She was 70 and 71 years old during the years at issue. Her husband, J.W. Hancock (Hancock, or her husband), was 75 years old when he died on December 31, 1985.

Petitioner has two sons, Trevor Hancock and Mark Hancock, who are real estate brokers and developers. Petitioner's nephew, Greg Hancock, is also a real estate developer.

B. Petitioner's Involvement in Real Estate

Petitioner began working with her husband in the real estate business in 1957 or 1958 in California. Petitioner and her husband moved to Arizona in the 1960's. They formed a publicly traded company called J.W. Hancock, Inc. Petitioner managed its day-to-day operations. The company subdivided and developed land

for residential and commercial construction. Petitioner and her husband owned 60 percent of the stock in J.W. Hancock, Inc.

The real estate market declined in the 1960's. Petitioner and her husband surrendered their stock in J.W. Hancock, Inc. They kept nine lots in Phoenix, Arizona, and built one house at a time.

C. J.W. Hancock Enterprises, Inc.

1. Incorporation

Petitioner and her husband incorporated J.W. Hancock Enterprises, Inc. (Hancock Enterprises), on May 1, 1973. From 1973 to 1986, Hancock Enterprises developed real estate in the Phoenix area. Petitioner was the executive vice president of Hancock Enterprises.

Petitioner and her husband established the J.W. Hancock and Margaret E. Hancock Trust (the trust) on September 23, 1976. Hancock was the trustee. The trust owned the stock of Hancock Enterprises.

2. Operation of Hancock Enterprises

Hancock Enterprises operated under the name of Camelot Homes (Camelot). Hancock Enterprises bought large tracts of land, subdivided and rezoned the tracts, made improvements such as roads and sidewalks, and delivered sewer and water lines to the property.

Petitioner and her husband jointly ran Hancock Enterprises. Petitioner designed houses, developed floor plans, worked with subcontractors to compute sale prices, ran the sales office, sold houses, supervised assistants, created sales brochures, met with accountants at Toback & Co. to discuss financing, engaged in public relations, and handled customer complaints. Hancock handled the acquisition of property and obtained acquisition and development loans. After Hancock obtained the initial loans, petitioner met with the banks and arranged for construction and operating loans.

Hancock Enterprises built five to seven model homes in each of its subdivisions and had salespeople in the model homes. It sold the model homes when it no longer needed them. Hancock Enterprises built all the homes except the model homes for specific buyers.

Hancock Enterprises developed the Summer Shadows and Camelot Village subdivisions in 1976 or 1977, the Playa Del Sur subdivision in 1977, and the Estate La Colina, Estate Los Arboles, and Paradise Village North subdivisions in 1978. In 1977 and 1978, Hancock Enterprises was offering lots for sale in at least five subdivisions.

Until the 1980's, Hancock Enterprises sold all of the model homes after it completed a subdivision. Beginning in the 1980's,

Hancock Enterprises sometimes held back (i.e., did not sell) some lots that were harder to sell from each subdivision.

### 3. Accountants and Bookkeeper

Toback & Co., C.P.A.'s (Toback), were the accountants for Hancock Enterprises. John J. Gorman, Jr. (Gorman), began handling the Hancock Enterprises account in 1981. Toback prepared all of the Hancock Enterprises returns from 1973 to 1986 and prepared petitioner's individual tax returns from 1987 to 1994. Petitioner worked closely with Toback's accountants, including Gorman. She met with Gorman nearly monthly from 1981 to 1985. Her husband met with Gorman once or twice from 1981 until he died in December 1985.

Hancock Enterprises stopped building houses in 1982 or 1983 and began selling its lots because interest rates were 18 and 19 percent. It laid off its superintendents, foremen, and architects. Hancock Enterprises had about 115 lots when it stopped building homes.

### 4. Building Industry in Phoenix

The homebuilding market in Phoenix peaked around 1984-86. The number of building permits issued in Phoenix declined from then until 1990. Residential real estate prices also declined after 1986. High interest rates caused some buyers to abandon their deposits on lots. Hancock Enterprises' buyers canceled contracts for three lots in the Summer Shadows subdivision

because buyers could not get financing due to the high interest rates. The larger builders in Phoenix "bought down" mortgage interest rates from 18 to 9 percent for their home buyers, but Hancock Enterprises could not afford to do that.

After Hancock Enterprises stopped building houses, petitioner and her husband explored other development activities. In 1985, they considered the possibility of building 5,000 low-cost houses for the Government of Ecuador. About that time, Hancock Enterprises sold some lots to repay its loans. In 1985, Hancock Enterprises owed about $2.5 million to the banks and $800,000 to petitioner and her husband.

In 1987, the City of Phoenix proposed to build a freeway near Summer Shadows. This made it harder for petitioner to sell lots in Summer Shadows. Petitioner later sold those lots when the City of Phoenix built the freeway about 12 blocks from Summer Shadows.

The Phoenix real estate market improved from 1991 to 1994.

5.   Liquidation of Hancock Enterprises

Petitioner became the trustee of the trust after her husband died on December 31, 1985. The parties agree that petitioner's basis in Hancock Enterprises' stock stepped up to the date of death value under section 1014(b)(6).

Hancock Enterprises made a bulk sale of six Playa del Sur lots in 1986 for $52,870 per lot.

Petitioner's counsel, John Pattullo, advised her for tax purposes to liquidate Hancock Enterprises and distribute its assets to the trust. On December 31, 1986, Hancock Enterprises owned 48 lots from subdivisions it had developed. On that date, Hancock Enterprises adopted a plan of liquidation under section 337 (as then in effect), filed final corporate tax returns, and distributed the 48 remaining lots to the trust. After the liquidation, the trust owned the 48 lots.

D. Lots Petitioner Sold From 1987 to 1996

1. Petitioner's Sales Efforts

Selling lots was petitioner's primary activity from 1987 to 1994. Petitioner maintained liability insurance and paid property taxes on the lots at all times. She met with people who wanted to build houses on the lots. Some prospective buyers who were interested in buying lots contacted petitioner. She reduced the price of some lots. She put "for sale" signs on some lots. She attended some homebuilders' meetings and used her contacts in the real estate industry to help sell the lots.

Petitioner listed some of the 48 lots for sale with Trevor Hancock from 1987 to 1991. He listed those lots on the Multiple Listing Service (MLS). Two of petitioner's properties were listed on the MLS in 1987 and 1988, three in 1989, one in 1990,

and five in 1991.[1]  Petitioner paid real estate commissions of $13,653 in 1987, $2,110 in 1990, $23,244 in 1991, and $750 in 1992.

After 1986, petitioner sometimes worked in an office at Mark Hancock's place of business.  She paid no rent to him.  She had no other real estate office.

Petitioner has not subdivided or rezoned any property, made offsite improvements, or installed water and sewer lines on any property since she liquidated Hancock Enterprises.  From 1987 through the years in issue, petitioner had no advertising expenses.  After she received the lots in liquidation, petitioner regularly met with Gorman to discuss whether to acquire more property.

## 2.   Sales of Lots

From 1987 to 1996, petitioner sold 47 of the 48 lots that she had acquired in the liquidation as follows:

| Year | Number of lots sold | Cost | Basis | Sale price | Economic gain | Tax loss |
|------|---------|-----------|-----------|-----------|-----------|-----------|
| 1987 | 7 | $222,395 | $499,000 | $397,135 | $174,741 | ($230,972) |
| 1988 | none | -- | -- | -- | -- | -- |
| 1989 | 2 | 28,826 | 155,000 | 145,000 | 116,174 | (132,880) |
| 1990 | 3 | 54,396 | 193,000 | 165,200 | 110,804 | (165,782) |
| 1991 | 13 | 482,644 | 871,000 | 688,000 | 230,926 | (247,805) |
| 1992 | 11 | 230,258 | 753,000 | 488,670 | 258,412 | (299,807) |
| 1993 | 4 | 53,491 | 355,000 | 190,000 | 136,509 | (207,850) |
| 1994 | 4 | 43,906 | 370,000 | 215,000 | 171,094 | (166,599) |
| 1995 | 2 | 28,826 | 150,000 | 100,000 | 71,174 | (124,996) |
| 1996 | 1 | 14,897 | 75,000 | 50,000 | 35,103 | (47,759) |
| Total | 47 | 1,159,639 | 3,421,000 | 2,439,005 | 1,304,937 | (1,624,450) |

---

[1] The record contains no evidence that petitioner listed property for sale with any realtor from 1992 to 1994.

Petitioner sold three of these lots to Trevor Hancock (one lot per year in 1994, 1995, and 1996) for a total of $160,000. Petitioner and Hancock Enterprises' investment in these three lots was $35,882, but petitioner had a basis in the three lots totaling $235,000.

Petitioner used the sale proceeds from the lots to repay loans she and her husband used to obtain the lots, repay herself the $800,000 that Hancock Enterprises owed her, and pay land taxes associated with the lots.

In 1986 and 1990, petitioner bought five lots and sold them soon after she had acquired them. She bought one lot in 1986 and sold it in 1987. She bought four lots in 1990; she sold one of those in 1990, two in 1991, and one in 1992. In 1996, she owned only one lot.

E.   Other Hancock Real Estate Ventures

1.   The Mark Hancock Corp.

Mark Hancock began to operate his own real estate business in 1973. He started building houses in 1977 or 1978. He operated the Mark Hancock Real Estate Development Corp. (Mark Hancock Corp.) from the 1980's through the years in issue. After 1986 and through the years in issue, the Mark Hancock Corp. used the trade name "Camelot Homes". The Camelot Homes operated by the Mark Hancock Corp. represents to the public that it is the second generation of the Camelot Homes operated by petitioner and

her husband.  The Mark Hancock Corp. developed several subdivisions during the 1980's and 1990's.

In February 1986, Hancock Enterprises deeded two lots in the Playa del Sur subdivision to petitioner, which she immediately sold to Mark Hancock.  He paid $104,270 for the two lots.  The Mark Hancock Corp. built houses on those lots at a date not specified in the record.

2.   Greg Hancock Corp.

Greg Hancock Corp. developed subdivisions with about 80 lots in 1986, 220 lots in 1987, and about 68 lots in 1988.

F.   Petitioner's Tax Returns

Hancock Enterprises treated the 48 lots it held when it was liquidated as inventory on its books.

Petitioner reported the amounts realized from the sale of lots in 1987 as gross receipts on a Schedule C attached to the trust's 1987 tax return.  She treated her adjusted basis as the cost of goods sold and deducted several other expenses.

Petitioner reported sales of lots as sales of inventory on the Schedules C attached to her returns for 1989 to 1996.  She reported the amounts she realized from those sales as gross receipts and her adjusted basis as cost of goods sold, and she deducted several other expenses.

Petitioner reported on Schedules C for 1987 and 1989-96 that she was in the real estate development business.

G.   Statements by Petitioner's Representatives

Respondent's revenue agent, Patricia Burson (Burson), met with petitioner's representatives, Howard Kesselman (Kesselman) and Carrie Ransil (Ransil), during the audit.  At the time, Kesselman was a consultant for (and not an employee of) Toback, and Ransil had been employed by Toback for 1 month.  At the audit, Kesselman and Ransil told Burson that Hancock Enterprises sometimes held back lots from subdivisions for petitioner and her husband for investment.  Ransil had not met petitioner and was unfamiliar with petitioner's operations at the time of the audit.

OPINION

Petitioner contends that the eight lots she sold in 1993 and 1994 were held for sale to customers in the ordinary course of her trade or business, and thus that the tax losses from her sales of those lots that resulted because of the step-up in basis under section 1014(b)(6) at her husband's death are ordinary losses under section 1221(1).  Respondent contends that petitioner did not hold the eight lots for sale to customers, and that the sales were not in the ordinary course of a trade or business, and thus petitioner's losses are capital losses.

A.   Whether Petitioner Held Lots for Sale to Customers in the Ordinary Course of Her Trade or Business

1.   Section 1221(1)

Section 1221(1) excludes from classification as a capital asset--

> stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *

Section 1221(1) differentiates between the "'profits and losses arising from the everyday operation of a business' * * * and 'the realization of appreciation in value accrued over a substantial period of time'". Malat v. Riddell, 383 U.S. 569, 572 (1966) (quoting Corn Prods. Refining Co. v. Commissioner, 350 U.S. 46 (1955), and Commissioner v. Gillette Motor Transp., Inc., 364 U.S. 130 (1960)). "[P]rimarily" means "principally" or "of first importance." Id.

Whether property is held by a taxpayer "'primarily for sale to customers in the ordinary course of * * * business'" is a question of fact. S & H, Inc. v. Commissioner, 78 T.C. 234, 242 (1982) (quoting sections 1221(1) and 1231(b)(1)(B)). Courts consider numerous factors in deciding this issue, and no one factor controls. See Biedenharn Realty Co. v. United States, 526 F.2d 409, 415 (5th Cir. 1976). Petitioner bears the burden of proving that her property was held for the purpose she contends. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

The following factors indicate whether property is held primarily for sale to customers in the ordinary course of a trade or business: (a) The frequency and substantiality of sales, (b) the nature of the taxpayer's business, (c) the purpose for which

the taxpayer acquired and held the property before sale, (d) the time and effort the taxpayer habitually devoted to the sales, (e) the extent to which the taxpayer improved the property, and (f) the length of time the property was held. See Byram v. United States, 705 F.2d 1418, 1424 (5th Cir. 1983); United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969); Ross v. Commissioner, 227 F.2d 265 (5th Cir. 1955), revg. T.C. Memo. 1954-177; Goldberg v. Commissioner, 223 F.2d 709 (5th Cir. 1955), revg. 22 T.C. 533 (1954); Guardian Indus. Corp. v. Commissioner, 97 T.C. 308, 316-317 (1991), affd. without published opinion 21 F.3d 427 (6th Cir. 1994); Cottle v. Commissioner, 89 T.C. 467, 487-488 (1987). We will apply the factors that are relevant to this case.

2. Application of Factors

The frequency and substantiality of sales is the most important factor. See Suburban Realty Co. v. United States, 615 F.2d 171, 176 (5th Cir. 1980); Biedenharn Realty Co. v. United States, supra at 416; Buono v. Commissioner, 74 T.C. 187, 199 (1980). Petitioner's sales were frequent, regular, and substantial during the years in issue. Petitioner sold 7 lots in 1987, 2 in 1989, 3 in 1990, 13 in 1991, 11 in 1992, 4 in 1993, 4 in 1994, 2 in 1995, and 1 in 1996. She sold eight lots during the years in issue (1993-94).

Respondent argues that petitioner's failure to sell more than eight lots during the years in issue shows she did not hold the lots as inventory. We disagree. The sale of eight lots was substantial in light of the fact that, at the start of the years in issue, petitioner had only 12 of the 48 lots left. See Thompson v. Commissioner, 322 F.2d 122, 127-128 (5th Cir. 1963) (taxpayer's sales declined from 20 in the first year to 8 in the second year because, at the start of the years in issue, he had only 37½ of the original 387 lots left to sell), affg. in part and revg. in part 38 T.C. 153 (1962).

Respondent contends that the fact that petitioner sold more lots when the real estate market improved in 1991 shows that she held the lots for investment rather than for sale. We disagree. Petitioner began to sell lots in 1987, soon after Hancock Enterprises distributed them to her, despite the fact that residential real estate prices declined after 1986. She sold 12 of her 48 lots before 1991, which shows that she was not merely waiting for the market to rebound.

Respondent points out that some of the sales were to petitioner's sons and argues that those were not sales in the ordinary course of business.[2] We disagree. Petitioner made a large economic profit on the sales to her sons. The fact that

---

[2]Respondent does not contend that sec. 267 applies to the lot petitioner sold to Trevor Hancock in 1994.

parties to a transfer are related does not mean the transfer was not in the ordinary course of business if the parties act at arm's length.  See Beveridge v. Commissioner, 10 T.C. 915, 918 (1948).

Petitioner's sales were substantial during the years at issue (sales of $190,000 in 1993 and $215,000 in 1994), with an economic profit of $136,000 in 1993 and $171,000 in 1994.  See Lewellen v. Commissioner, T.C. Memo. 1981-581 (sale of 31 lots over a 12-year period coupled with sales of $151,400 during the years at issue suggests that the lots were held primarily for sale to customers in the ordinary course of business).

Respondent contends that the fact that petitioner had large tax losses from the sale of the lots from 1987 to 1994 shows that she was not in the trade or business of real estate because she would have abandoned the business to avoid having those tax losses.  Respondent also contends that petitioner could have sold the lots if she had lowered their prices.  We disagree. Petitioner derived economic profit of $1,304,937 from selling 47 of the 48 lots from 1987 to 1996; she did not sell them primarily to generate tax losses.  If petitioner had abandoned her efforts to sell the lots or sold them for less, she either would have been left with unsold lots or had smaller economic profit and larger tax losses.

Respondent contends that petitioner intended to hold the lots for investment until the real estate market improved, and that petitioner was not in the business of selling or developing real estate because she was not developing properties and was not looking for development opportunities.

We disagree. Petitioner began selling the 48 lots as soon as she received them from Hancock Enterprises. This suggests that she was not holding them for investment. The fact that sales occur in the course of a liquidation neither compels nor forecloses a finding that property was held primarily for sale in the ordinary course of a trade or business. See Ehrman v. Commissioner, 120 F.2d 607, 610 (9th Cir. 1941), affg. 41 B.T.A. 652 (1940) and Heller v. Commissioner, 41 B.T.A. 1020 (1940); Van Bibber v. Commissioner, T.C. Memo. 1985-344. We disagree with respondent's contention that petitioner did not hold the lots for sale because she was not in the real estate development business. Even if petitioner was not developing real estate, she was in the business of selling lots to customers.

Respondent contends that petitioner did not devote much time or effort to selling her lots, and that she did not advertise or use real estate agents or salespeople. Respondent also contends that the fact that petitioner borrowed office space at Mark's place of business shows that she was not operating a real estate business.

We disagree. Petitioner sold the lots by putting "for sale" signs on some of the lots and using her real estate contacts. She also paid real estate commissions of about $40,000 from 1987 to 1992. Petitioner begin selling lots in 1987 and sold 25 percent of them before 1991 when the market rebounded, 75 percent of them before the years in issue, and all but one of them in less than 10 years. The fact that petitioner sold the lots without using an outside agent, without having her own real estate sales office, and without incurring advertising expenses or broker's fees suggests that petitioner devoted enough time and effort to selling the lots. See United States v. Winthrop, 417 F.2d at 912, in which the U.S. Court of Appeals for the Fifth Circuit stated:

> While advertising, solicitation and staff are the usual components of a business, they are not a necessary element in either the concept or the pragmatics of selling. Here it is evident that the taxpayer was quite successful in selling the lots without the assistance of these usual props. It is not necessary that customers be actively and fervently and frenetically sought. * * *

Respondent contends that the fact that petitioner did not improve the 48 lots she received from Hancock Enterprises shows that she held them for investment. We disagree. Petitioner and her husband's corporation, Hancock Enterprises, fully developed the lots before petitioner acquired them. Petitioner paid real estate taxes, maintained liability insurance, and made sure that the lots were kept clean, the grass was cut, and the shrubs were

maintained. See <u>Kesicki v. Commissioner</u>, 34 T.C. 675, 678-679 (1960) (the taxpayer held property for investment even though he did not develop it before he sold it).

Respondent contends that the fact that petitioner had held the lots since 1987[3] suggests that she held them primarily for investment. We disagree. A long holding period suggests property was held for investment; alone, however, it does not establish that a taxpayer held property for investment. See <u>Suburban Realty Co. v. United States</u>, 615 F.2d at 184-185 (the taxpayer's primary purpose for holding real estate up to 33 years was for sale to customers); <u>United States v. Winthrop</u>, <u>supra</u> at 907, 909, 911 (the taxpayer held lots up to 25 years for sale to customers); <u>Walsh v. Commissioner</u>, T.C. Memo. 1994-293 (income from the sale of a parcel of 13 acres a taxpayer had held for 13 years was ordinary income), affd. without published opinion (8th Cir., July 11, 1995); <u>Tollis v. Commissioner</u>, T.C. Memo. 1993-63 (the taxpayer's proceeds from the sale of 9 parcels of real property over an 8-year period were ordinary income; his decision to retire from the real estate business did not convert the parcels into capital assets), affd. without published opinion 46 F.3d 1132 (6th Cir. 1995); <u>Herndon v. Commissioner</u>, T.C. Memo.

---

[3] Respondent does not contend that we should consider the fact that Hancock Enterprises held the lots from 1977 to 1986 in deciding if petitioner held them for sale to customers.

1968-135 (lots that were held for over 20 years by the taxpayer were held for sale in the ordinary course of business).

3.    Respondent's Other Contentions

Burson testified that petitioner's representatives Ransil and Kesselman told Burson during the audit of petitioner that Hancock Enterprises kept some lots in each of its subdivisions for petitioner and her husband to hold for investment. Respondent contends that this shows petitioner held the lots for investment.  We disagree.  At the time of the audit, Kesselman was not an employee of Toback and Ransil had worked only 1 month for Toback and had not yet met petitioner.  Neither was fully familiar with her operations.

Respondent contends that petitioner's testimony that she could not sell the lots in the late 1980's is not credible because her son and her nephew were developing property in Phoenix during those years.  The record does not contain enough information for us to evaluate respondent's assertion.

Respondent contends that the fact that Mark Hancock began doing business in the name of "Camelot Homes" shows that petitioner was no longer in the real estate business.  We disagree.  First, Mark Hancock had been in the homebuilding business since the late 1970's; the fact that he began operating under the name "Camelot Homes" when Hancock Enterprises liquidated in 1986 does not seem significant to us because

Hancock Enterprises had stopped building homes around 1982 or 1983. Second, the fact that Mark Hancock used the "Camelot Homes" name does not show whether petitioner was still in the trade or business of selling lots to customers.

Respondent contends that the fact that petitioner and her husband held the lots for sale to customers through Hancock Enterprises does not mean she held them for sale to customers in 1993 and 1994 because (a) Hancock Enterprises began to hold the lots as an investment when it abandoned its plans to develop them around 1983 and decided to hold them until market conditions improved, and because (b) Hancock Enterprises' holding purpose is irrelevant in deciding petitioner's holding purpose. We disagree. First, Hancock Enterprises did not abandon its efforts to sell its lots. Hancock Enterprises had about 115 lots when it stopped building homes in 1982 or 1983, but it had only 48 lots when it liquidated at the end of 1986. This shows that Hancock Enterprises actively sold lots after it stopped building homes. See Suburban Realty Co. v. United States, supra at 184 (the court did not view the fact that the taxpayer stopped its development activities and had fewer sales several years before the years at issue as establishing that the taxpayer changed its holding purpose). Second, we may consider the holding purpose of Hancock Enterprises in deciding why petitioner held the lots. See Parkside, Inc. v. Commissioner, 571 F.2d 1092, 1096 (9th Cir.

1977) (in deciding the purpose for which the taxpayer held property, the court considered the holding purpose of the taxpayer's shareholders' father, from whom the shareholders inherited the property), revg. T.C. Memo. 1975-14.

B.   Conclusion

We conclude that petitioner held the eight lots she sold during the years in issue for sale to customers in the ordinary course of her trade or business.  Petitioner's sales were frequent, regular, and substantial in the years in issue.  She devoted a sufficient amount of time and effort to selling the lots.  She began to sell the lots when she received them from the corporation.  The fact that petitioner held some of the lots for a substantial period of time before she sold them does not in itself establish that she held the lots for investment.

To reflect the foregoing and concessions,

Decision will be entered
under Rule 155.